IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PINEBROOK HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-1562 |
| | ) | |
| AARON NARUP, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

The court should grant defendants' motion for summary judgment on all counts

of the second amended complaint for the following reasons.

**1.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
COUNTS 2 THROUGH 8 BECAUSE PLAINTIFFS HAVE NO DAMAGES
IN THAT THEIR PURPORTED LOST PROFITS, THE ONLY DAMAGES
ALLEGED, ARE SPECULATIVE AND WERE NOT CAUSED BY THE
ALLEGED MISCONDUCT.**

Counts 2 through 8 of the Second Amended Complaint ("Complaint") are all tied

together by the common theme that defendants Aaron Narup and Stephen J. Reuter, on

their departure from their employment by plaintiff PH Financial Services ("Manage-

ment Company"), took with them "trade secrets," which defendants then used to

compete unfairly with plaintiffs.

Plaintiffs' claim in counts 2 through 8 that they lost profits "due to their inability

to implement an Omni Channel platform and service loans online/remotely." *Statement

of Uncontroverted Material Facts ("SUMF") 34.*[1]

---

[1]     Through sloppy cut-and-paste drafting, plaintiffs include their Computer
Fraud claim's "investigative costs" in their damages for every count, even though inves-
tigative costs are not recoverable under any of their other legal theories. Plaintiffs

Defendants do not identify any other compensatory damages.[2]

"Omni Channel" refers to a function in the QFund loan management software licensed by Management Company from the software's publisher, Virinchi Limited ("Virinchi"). Omni Channel is Virinchi's term for its software's ability to make and process loans simultaneously online and in a brick-and-mortar store. *SUMF 35*.

> QFund caters to the needs of clients with both Storefront and Online lend-ing business models with a Hybrid solution that includes the Point of Sale (PoS) application for Stores and a Loan Management System (LMS) for internet and with a converged database to manage customers on either of the platforms.

*Id.*

Although plaintiffs' inability to implement Omni Channel is now the keystone of plaintiffs' damages claim, Omni Channel is never mentioned in the Complaint. The Complaint says nothing about plaintiffs being damaged by their supposed inability to simultaneously make and process loans both online and in stores. [Doc. 97-1].

Plaintiffs first identified the Omni Channel issue as the basis — the sole basis — of their alleged damages in their interrogatory answers. Plaintiffs were asked to describe all of the business they claimed they had lost as a result of defendants' actions and to state the damages each plaintiff suffered as a result. Plaintiffs answered:

> [I]nstallation of QFund10 software into Plaintiffs' stores was delayed due to the actions of Defendants. If Plaintiffs had been able to convert Store 26 to QFund10 in fall 2018, QFund would have then been committed to upgrading the rest of the Plaintiffs' loan stores before the beginning of the

---

acknowledged in their corporate representative deposition that the only damages sought under Counts 2 to 7 were lost profits. *SUMF 53*. Count 8 alleges unjust enrichment, but when asked how much of a benefit defendants' received from their wrongful acts, plaintiffs' corporate representative testified, "I don't know." *SUMF 59*.

[2]     In the Complaint, plaintiffs did not request any actual damages in Counts 4 and 8. This argument assumes they intended to request such damages.

busy Christmas season. As such, all stores would have had the Omni-channel platform for the entirety of 2019.

Conservative projections suggest that each store would have been able to write a minimum of 15 additional loans every month. Considering the 44 stores, with a mix of lending products, the projected loss exceeds $2,000,000 annually. Based on these projections and the actual time lost caused by Defendants' actions (nearly 18 months), lost revenue exceeds $3,200,000.

*SUMF 38*. Plaintiffs provided a chart showing how they calculated the alleged losses. *Id.*

Setting aside for the moment plaintiffs' Computer Fraud investigation costs, the only damages plaintiffs' corporate representative identified were for lost revenues.

QUESTION: ... but the damages that you're prepared to testify to are the lost profits, the chart that you provided.

ANSWER: Yeah, I'm prepared to testify about that document. ...

ANSWER: Well, our lost revenues I believe are damages, and then understand, prior to, prior to Covid, all of our stores were profitable, so we're taking — what we want to do is we want to say okay, we've got a profitable store, how do we generate more revenue to make it more profitable, and, you know, this would be over the course of, you know, 12 or 18 months lost revenue.

*SUMF 52*.

Plaintiffs produced a new damages model April 2, 2021.. *SUMF 54*. Like their first damages model, the new model relies on the same two factually unsupported assumptions: (1) every loan store operated by plaintiffs would have had Omni Channel capabilities by October 2019, and (2) each of plaintiffs' loan stores would have made an additional 15 loans per loan product per month but for defendants' actions.

Specifically, plaintiffs claim that if the loan stores owned by plaintiffs St. Louis Financial Group, West Coast Premier Financial, Los Angeles Financial Group, Louisiana Financial Group, California Financial Group, Pacific Cash Advance, and Flexible

Finance of Wisconsin (together, "Storefront Lenders") had the ability through Omni Channel to make and service loans both in person and online, each loan store would have made an additional 15 loans, per product, per month.

Summary judgment should be granted because (1) there is no genuine issue of fact that plaintiffs' failure to implement Omni Channel was not caused by any defendant, and (2) both the fact and amount of the alleged lost profits are speculative.

### A.   Omni Channel is not plaintiffs' trade secret and was not misappropriated.

In each of these counts, plaintiffs ask for lost profits "sustained by Plaintiffs as a result of Defendants' misappropriation and wrongful use or disclosure of [Management Company's] trade secrets." [Doc. 97-1 ("WHEREFORE" clause ¶ B) at 28, 31, 34, 36, and 38].[3] Because plaintiffs are claiming lost profits resulting from misappropriation of trade secrets, the revenue must have been lost *as a result of* the misappropriation of those trade secrets and not as a result of some other cause.

Plaintiffs' lost profits supposedly resulted from Storefront Lenders being delayed or prevented from implementing Omni Channel in their stores. But Storefront Lenders were always licensed to use Omni Channel; *they just chose not to install it*. Plaintiffs do not explain how defendants could misappropriate from Storefront Lenders something they continued to have the ability to use. When asked in an interrogatory to, "Identify all documents, materials, or information any plaintiff alleges were taken and retained by any defendant to which plaintiffs no longer have access as a result of any defendants' actions," plaintiffs admitted that the answer was "none." *SUMF 89.*

---

[3]      The WHEREFORE clauses in Counts 4 and 8, which allege breach of duty of loyalty and unjust enrichment, respectively, do not request compensatory damages. Each instead only requests punitive damages and attorney fees. [Doc. 97-1 at 32, 39].

Omni Channel is not a trade secret. *At least, it is not plaintiffs' trade secret*. It belongs to Virinchi. QFund's Omni Channel is a standard program option available to any licensed QFund user. *SUMF 37*. It has been available to Management Company since 2014. *SUMF 18*. Plaintiffs never explain how a software application widely licensed by its publisher can be a trade secret to a licensee, a notion absurd on its face. "It is a completely frivolous contention on plaintiff's part to assert that publicly sold software … is plaintiff's proprietary information." *Young Dental Manufacturing Co. v. Q3 Special Products*, 891 F.Supp. 1345, 1350 (E.D. Mo. 1995). "By definition, trade secret law does not protect information in the public domain or otherwise readily ascertainable." *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1235 (8th Cir. 1994).

Virinchi's description of Omni Channel on its website, *see page 2 supra*, parallels the description of "Base QFund Application" in Management Company's 2014 license with Virinchi. Under that license, Virinchi agreed to supply Management Company with "QFund Storefront Application," described as a financial software program that includes a "Point of Sales interface for use by Store users … to disburse & service Loans." Virinchi also agreed to implement the QFund Storefront Application "in a hybrid dual instance model with QFund Internet Lending Management Solution," an application that includes "Loan Management System (LMS) interface for use by LMS users … to disburse & service Internet Loans." *SUMF 17, 37*.

Because Omni Channel is part of the base QFund software product licensed by both plaintiffs and defendants. Plaintiffs cannot legitimately call it their trade secret.

Plaintiffs never installed or used the Omni Channel function of QFund. That was plaintiffs' choice. It is not defendants' fault. Plaintiffs always had the right under their

software license to use Omni Channel. The same is true of defendants, who also had a license to use Omni Channel and who, like plaintiffs, also did not use it. *SUMF 52.*

There can be no misappropriation of a trade secret without a trade secret, or where the party claiming to be deprived still has what he had before, or where the alleged wrongdoer paid the rightful owner for the right to use the "trade secret."

### B.   Management Company and Internet Lender claim no damages and thus summary judgment is proper as to them.

Plaintiffs do not identify any damages suffered by either Management Company or Danridge Holdings, LLC ("Internet Lender"). *SUMF 6, 49.*

Each plaintiff "exists as a separate and distinct legal entity and each company observes separate corporate formalities." *SUMF 2.* "As a general rule, a plaintiff may only assert his own injury in fact and cannot rest his claim to relief on the legal rights or interests of third parties." *Hodak v. City of St. Peters*, 535 F.3d 899, 903-904 (8th Cir. 2008). While plaintiffs claim they share a unity of interest, "two separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375 (Mo. App. 2014).

According to Brian Stoltz, plaintiffs' corporate representative, Omni Channel was only going to be implemented in loan stores with "storefronts," that is, stores owned by Storefront Lenders. *SUMF 36.* Management Company has no storefronts and does not make loans to customers. *SUMF 49.* Internet Lender also has no storefronts; it owns subsidiaries that make internet loans only. Neither Management Company nor Internet Lender were included in the damage models. *SUMF 49.* Internet Lender has another reason for not claiming damages: it never used QFund software. Instead, Internet Lender uses loan management software published by a company named Infinity. *SUMF 22.*

### C.     Damages and Lost Profits Generally.

Damages are a necessary element to each cause of action in Counts 2 through 8 of the Complaint. *See Allstate Ins. Co. v. Head*, 2018 U.S. Dist. LEXIS 196341, *19 (W.D. Mo. 2018) (Defend Trade Secrets and Missouri Trade Secrets Act); *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 15 (Mo. 2012) (breach of duty of loyalty); *Hanna v. Darr*, 154 S.W.3d 2, 5 (Mo. App. 2004) (breach of contract); *Community Title Co. v. Roosevelt Fed. Sav. & Loan*, 796 S.W.2d 369, 372 (Mo. 1990) (tortious interference).

Plaintiffs' theory of the case is that they lost profits because defendants prevented or delayed Storefront Lenders from implementing Omni Channel into their stores, thus denying them access to the immediately profitable new business of internet lending.

"[T]he question of lost profits as an item of damages is primarily a problem of proof and it is for the district court initially to determine whether the moving party has produced the quantum and quality of evidence sufficient to establish the claim in a sum certain." *Cargill, Inc. v. Taylor Towing Services, Inc*, 642 F.2d 239, 241 (8th Cir. 1981).

### D.     Plaintiffs' lost profits damage claims are speculative

Even if a delayed opportunity to use publicly-available software could be the basis of a trade secret misappropriation claim, plaintiffs' damages are speculative and thus insufficient to establish the element of damages needed for each cause of action.

> The general rule under Missouri law is that anticipated profits of a commercial business are too remote and speculative to warrant recovery. They can only be recovered when they are made reasonably certain by ***proof of actual facts***, with present data for a rational estimate of their amount. ***The proof required to sustain lost profits is exacting***. Competent and substantial evidence is required to support an award of damages. Moreover, speculation as to probable or expected lost business profits is spurned, and an unsupported opinion or estimate of a loss of profits is generally held to be insufficient.

*Tipton v. Mill Creek Gravel*, 373 F.3d 913, 918 (8th Cir. 2004) (emphasis added, citations, quotations omitted). "Speculation as to probable or expected lost business profits is spurned, and proof of lost profits must be substantial." *Ozark Emp. Specialists v. Beeman*, 80 S.W.3d 882, 897 (Mo. App. 2002). Recovery of lost profits "is prohibited when there is uncertainty or speculation as to whether the loss of profits was the result of the wrong, and whether any such profits would have been derived at all." *Thoroughbred Ford v. Ford Motor Co.,* 908 S.W.2d 719, 735 (Mo. App. 1995).

"Missouri law is clear that an established business may recover anticipated profits only where there is proof of income and expenses for the period prior to the alleged injury to the business." *Midwest Coal, LLC v. Cabanas*, 378 S.W.3d 367, 373 (Mo. App. 2012). "While new businesses are not required to present historical data to recover lost profit, new businesses labor under a greater burden of proof in overcoming the general rule that evidence of expected profits is too speculative, uncertain, and remote to be considered." *Id.* (quotation omitted).

Storefront Lenders have never operated online loan businesses. It would be a new business for them. Because it is impossible for them to present evidence of prior income and expenses related to operating online loan stores, the Storefront Lenders must satisfy an even "greater burden of proof" to show they are entitled to lost profits.

Here, plaintiffs claim that if all of Storefront Lenders loan stores had had Omni Channel operating by the end of 2018, each store that makes payday loans would have made an additional 15 payday loans per month, and each store that makes installment loans would have made an additional 15 installment loans per month.

Stoltz admitted that plaintiffs' damages model requires one to find that, but for defendants' conduct, every store operated by plaintiffs would have had QFund10 with an

Omni Channel online presence installed and operating by the end of 2018. *SUMF 39, 54*. **No reasonable factfinder could make this finding.** As of March 2021, *29 months after Narup's and Reuter's employment with Management Company ended, only three of the loan stores had the upgrade to QFund10 installed*, one in March 2020 and the other two in May 2020, *and none of the three had online capabilities. SUMF 56*.

When asked why no stores had been upgraded since May 2020, Stoltz explained, "We've had a lot of issues … With QFund10, getting it fully functional." *SUMF 57*. The issues, according to Stoltz, are "*problems that come up with the software* that have to be addressed." *Id*. (emphasis added).

> ANSWER: We may never get to a point where we're fully converted to QFund-10.
>
> QUESTION: Why?
>
> ANSWER: Because of the answer I gave earlier, we've had a lot of issues with the first three stores that we have on QFund10.
>
> QUESTION: Okay. Issues that maybe make you not want to convert the rest of the stores to QFund10.
>
> ANSWER: Yeah, we're still working on QFund10 and the upgrade right now, but we may never get to the finish line with them.

*SUMF 58*.

At the time of Stoltz's deposition, it had been roughly 29 months since Narup and Reuter's employment with Management Company ended. In those 29 months, only three of the loan stores operated by Storefront Lenders had been upgraded to QFund10 and none of them had the Omni Channel capabilities installed. *QFund's publisher has been unable to provide Management Company or Storefront Lenders with QFund10 with Omni Channel functionality. **Clearly, the fault is not with the defendants but with the software.*** Yet plaintiffs continue to seek massive, speculative damages

based on the incredible assumption that all Storefront Lenders would have been fully upgraded by the end of 2018. Stoltz admitted that while plaintiffs have no evidence for the assumption, he still blames defendants: "I won't know when we could have been fully on QFund10, because that opportunity was stolen from my company." *SUMF 58*.

Stolen? How stolen? Stoltz and plaintiffs never say.

Plaintiffs' damages require a reasonable jury to be able to believe that, but for Narup and Reuter upgrading ACS to QFund10 before they left Management Company's employment, QFund's publisher would have been able to accomplish in the prior eight months what it has been unable to accomplish in the 29 months since.

No reasonable jury could believe this. It is speculation to the point of nonsense. It is incapable of supporting the damages plaintiffs claim.

But this is not the end of the speculation. Even if one could believe that Store-front Lenders' loan stores would have all been magically up and running on QFund10's Omni Channel platform by the end of 2018, it is an even grosser speculation to believe that using even the best loan management software would have created an instant demand for an additional 15 loans per loan product per month at all 44 loan stores.

When asked if having Omni Channel running would itself generate new business, Stoltz testified, "It allows us to generate that business. ... It opens us to other pools of clientele that aren't driving by or responding to our storefronts." *SUMF 50*. Stoltz admitted, however, that he was not aware of a single customer who came into a loan store and decided against taking out a loan because they had no online option. *SUMF 51*.

"Projecting ... lost profits upon a future demand that does not yet exist is exactly the kind of conjectural assumption that is disfavored by all Missouri courts that have addressed the issue of lost profits." *Tipton*, 373 F.3d at 919. "[E]vidence of projected

future sales not based on any particular order [is] properly excluded as too speculative." *Wash Solutions, Inc. v. PDQ Mfg.*, 395 F.3d 888, 894 (8th Cir. 2005).

In *Tipton*, plaintiff's lost profits theory was that because of increased local growth, they "would have been able to sell all the gravel and dirt within the mine plans for an enormous profit." 373 F.3d at 919. The plaintiff offered the following evidence:

> 1) that there was gravel and top-soil available to Mill Creek; 2) that the market value for gravel was $ 10 per yard, and $ 14 per yard for top-soil; 3) that the gravel available to Mill Creek could be used for some construction and landscaping purposes; 4) that one purchaser would have bought Mill Creek gravel for future projects, but he did not say how much; and 5) that there would be a demand for the gravel due to the growth of the area and the nearby construction of two four-lane highways.

*Id.* The theory was rejected by the court as too speculative. Here, plaintiffs' evidence is inferior to that held insufficient in *Tipton*. At least *Tipton* had *some* evidence, identifying one lost potential customer. Plaintiffs have identified none. When asked how plaintiffs concluded that each storefront would make an additional 15 loans per loan product per month using their internet capacity through Omni Channel, Stoltz testified:

> Well, we look at what our, our entity that does loans, [Internet Lender], what it can do, and we looked at the, you know, the limited capability of a storefront where you're limited again to your neighborhood essentially, you know, their capacity to write 35 plus loans per month, and so we feel that, you know, 15 loans per month is a good projection.

*SUMF 40.*

Of the 44 loan stores plaintiffs assert would have enjoyed this miraculously increased loan demand, 23 were located in Louisiana and 11 were in California. *SUMF 41*. Internet Lender, the company Stoltz considered when creating his damages models, did not make online loans in California or Louisiana at that time. *SUMF 42*.[4] Thus,

---

[4]    Plaintiffs filed their second amended complaint March 22, 2021 in which they alleged Internet Lender was not then operating any subsidiary LLCs that offered loans in California or Louisiana. [Doc. 97-1, ¶ 25]. Internet Lender's website has begun

plaintiffs would have the court believe that these 34 loan stores would enjoy this instant demand for online loans based on undisclosed data from a company, Internet Lender, that did not then make online loans in the states where those loan stores are located. And, in a further twist of mismatched facts, Internet Lender only made installment loans, not payday loans, whereas 37 of the Storefront Lenders' stores make payday loans. *SUMF 6, 54. Thus plaintiffs are basing their dreams of new business on the undisclosed data of Internet Lender, who mostly does not do business in the states where the businesses would be located and who mostly does not make the kind of loans the businesses would be making.*

Stoltz testified that he also looked at "some other competitors that had an Omni-channel platform" in making his damages model. *SUMF 44.* Only one of those competitors provided revenue information, according to Stoltz. *Id.* That company, CURO Financial ("CURO"), operates "about 484 storefronts" — an order of magnitude more than Storefront Lenders' 44 stores. *Id.* Is CURO's reported experience relevant? Plaintiffs offer no expert testimony saying that companies of such different sizes are comparable. Plaintiffs never produced the CURO revenue figures in discovery. The data from CURO, if it exists, is hearsay (Rule 801), inadmissible in evidence (Rule 802), not shown to be evidence of a type an expert would normally rely upon (Rule 703), causing Stoltz's opinions about damages to be inadmissible whether he is considered to be a lay witness (Rule 701) or an undisclosed expert witness (Rule 702).

---

offering payday loans in Louisiana. Internet Lender's new payday loan business venture in Louisiana, however, could not have factored into Stoltz's damages analysis because plaintiffs admitted on July 7, 2021, three months after plaintiffs' second damages model was produced, that Internet Lender did not operate in Louisiana. [Doc. 118, ¶ 42].

Stoltz did not identify sources of information other than Internet Lender and CURO that he used in creating the damages models. Stoltz did not identify any "actual facts" or "present data" from his sources beyond his "feeling" that 15 loans per month was a "good projection." A "rational estimate" cannot be generated from Stoltz's "feelings." *Tipton*, 373 F.3d at 918.

Plaintiffs' damages models also did not consider any impact on revenues from Covid-19, notwithstanding Stoltz's testimony that the pandemic impacted both Store-fronts Lenders' stores *and* Internet Lender's subsidiaries. *SUMF 45, 47*. The damages model projected an immediate increase in loans made, which would hold steady during the damages period. In the real world, however, the pandemic had a material negative impact on internet lending. Internet Lender's subsidiaries made 5,132 loans from January through October 2019. *SUMF 46*. Over the same period in 2020, Internet Lender's subsidiaries made 3,563 loans — a 30% decrease. *Thus the only plaintiff that makes online loans saw a 30% decrease during the key time period*. Yet plaintiffs speculate that in an Omni Channel world of unicorns and fairy dust, online loans would have held steady at 15 loans per product per month during the Covid-19 downturn.

Plaintiffs' calculation of revenues generated by these putative 15 loans per loan product per store per month involves even more speculation. Stoltz "took the average fee of 2019 for payday installment, and built out the projection." *SUMF 48*. The "fee" is the amount a loan store charges a customer for making a loan. Plaintiffs' first damages model projected loan revenue through June 2020, while their second model projects loan revenue into 2021, both based on the average fee charged in 2019. Relying on 2019 revenues conveniently allows plaintiffs to avoid analyzing and incorporating the impact from changing government regulations and the pandemic into their projections.

Finally, the wholly speculative nature of plaintiffs' alleged damages is further demonstrated by the "operating expenses" plaintiffs subtract from the revenue estimates in their second damages model. Plaintiffs apply a 32% bad debt expense reduction on the revenue generated to every loan made by every store, each and every month from October 2018 through February 2021. *SUMF 55*. Over that same period of time, Internet Lender's Delaware subsidiary averaged 62.87% in monthly loan expenses, its Idaho subsidiary averaged 81.22% in monthly loan expenses, its Missouri subsidiary averaged 54.77% in monthly loan expenses, its Mississippi subsidiary averaged 74.14% in monthly loan expenses, its New Mexico subsidiary averaged 63.2% in monthly loan expenses, its Utah subsidiary averaged 65.12% in monthly loan expenses, and its Wisconsin subsidiary averaged 65.8% in monthly loan expenses. *SUMF 43*. Advertising expenses are not included in these monthly loan expenses. Including advertising expenses would increase expenses as a percentage of revenue, further reducing profits, if any.

Internet Lender's subsidiary LLCs' loan expense numbers are not the same for each entity. Given that Stoltz purportedly relied only on Internet Lender's data to make his calculations, each of the 44 stores claiming lost profits should have different numbers too, based on market trends, locations, regulations, advertising expenses, etc., and not the single expense percentage used by Stoltz. But they do not use individualized data, because as in *Tipton*, plaintiffs' damages are speculative and detached from reality.

*Tipton* is in the mainstream of Missouri law. *Ozark Employment* similarly rejected evidence of purported lost profits as speculative where a plaintiff alleged it lost its ability to recruit programmers in the Philippines as a result of defendant's actions. 80 S.W.3d at 897. To prove its lost profits, plaintiff offered evidence of the performance of the company hired to replace plaintiff in recruiting Filipino programmers. *Id*. The

Court held the evidence insufficient because, "This evidence does not provide a reasonable certainty that [plaintiff] would have recruited the same sixty programmers and received the same fees" absent defendant's actions. *Id.*

Courts regularly reject efforts to show lost profits unsupported by analysis based on actual, applicable data. In *U.S. Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009), the court held proposed testimony claiming lost profits speculative when the witness "failed to perform any analysis of a viable market for the solar salt he expected to receive … and he lacked relevant and recent activity in the solar salt market." The court also noted that the witness "could not identify any customer interested in buying from US Salt a specific amount of solar salt at a specific price." *Id.*

Here, plaintiffs have no competent and sufficient evidence which shows with the "exacting degree of certainty" required that Storefront Lenders would have had (or ever will have) the Omni Channel capabilities upon which their alleged damages depend. Nor have plaintiffs shown that there was a demand for Storefront Lenders' planned online lending. To the contrary, the actual facts of plaintiffs' experiences with QFund since Narup and Reuter left the employment of Management Company demonstrate that Storefront Lenders would not have had Omni Channel functionality in their loan stores by the end of 2018 no matter what — and that, in fact, they likely never will.

Because plaintiffs lack substantial and competent evidence that they lost revenue, and because lost profits are the only category of damages plaintiffs seek on their trade secrets, breach of loyalty, breach of contract, and tortious interference counts, the court should grant defendants summary judgment on Count 2 through 8 for plaintiffs' failure to make a jury-submissible case on the essential element of damages.

### E. Plaintiffs have no evidence of unjust enrichment damages.

Plaintiffs also allege unjust enrichment against defendants. To make a submissible unjust enrichment claim, the plaintiff must prove that a benefit was received "and the value of that benefit." *Miller v. Horn*, 254 S.W.3d 920, 925 (Mo. App. 2008). A plaintiff cannot simply state the total value of any benefit received by a defendant. Rather, a plaintiff must prove the amount of the benefit that "would be *unjust* for one party to retain." *White v. Pruiett*, 39 S.W.3d 857, 863 (Mo. App. 2001) (emphasis added). The amount of the unjust benefit must be established with reasonable certainty. *Boswell v. Panera Bread Co.*, 2016 U.S. Dist. LEXIS 64443, *11 (E.D.Mo. 2016).

Plaintiffs' supplemental Rule 26 disclosures do not state anything about unjust enrichment damages. Plaintiffs are silent as to any unjust benefits they claim any defendant received. *SUMF 59.* Instead, plaintiffs point to the losses they allege plaintiffs suffered. *But a plaintiff's loss is not a benefit to a defendant.* Plaintiffs have failed to allege, let alone establish, this necessary element of their unjust enrichment claim.

### 2. THE COMPUTER FRAUD CLAIM FAILS BECAUSE PLAINTIFFS HAVE NOT HAD A "LOSS" WITHIN THE MEANING OF THE STATUTE.

The only other damages claimed by plaintiffs relate to Management Company's Computer Fraud and Abuse Act ("CFAA" or "Computer Fraud") claim against Narup and Reuter. Summary judgment is proper here because Management Company did not suffer a "loss" under the Act. Loss is an essential element of this claim.

"CFAA … allow[s] a private party to bring a civil action for violations of Section 1030 if the alleged violation involves one of five factors set forth in subclauses (I), (II), (III), (IV), or (V) of Section 1030(c)(4)(A) (i)." *Burnett v. Grundy*, 2014 U.S. Dist. LEXIS 192624, *4-5 (W.D.Mo. 2014), citing 18 U.S.C. § 1030(g).

Of those five factors, the one claimed by plaintiffs is subclause (I), which requires a "loss to 1 or more persons during any 1-year period [] aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I). "Loss" for this purpose is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

Here, plaintiffs cannot establish a "loss" under the Act.

The U.S. Supreme Court recently held:

> The statutory definitions of "damage" and "loss" ... focus on technological harms — such as the corruption of files — of the type unauthorized users cause to computer systems and data. Limiting "damage" and "loss" in this way makes sense in a scheme aimed at preventing the typical consequences of hacking. The term's definitions are ill fitted, however, to remediating "misuse" of sensitive information that employees may permissibly access using their computers.

*Van Buren v. U.S.*, 141 S. Ct. 1648, 1659-1660 (2021) (citations omitted); *see also Dewitt Ins., Inc. v. Horton,* 2014 U.S. Dist. LEXIS 72384, *10-11 (E.D. Mo. 2014) ("The weight of relevant authority restricts the CFAA 'loss' requirement to actual computer impairment"); *Pipeline Prods. V. S&A Pizza, Inc.,* 2021 U.S. Dist. LEXIS 197991 *18 (W.D.Mo. 2021) (dismissing CFAA claim where plaintiff "pleads no facts to plausibly show that it spent any funds ... to respond to or restore anything concerning the social media accounts various Defendants tried to access"); *Am. Fam. Mut. Ins. Co. v. Rickman*, 554 F.Supp.2d 766, 772 (N.D. Ohio 2008) ("The CFAA does not contemplate consequential damages ... that are unrelated to harm to the computer itself"); *Civic Ctr. Motors, Ltd. v. Mason St. Import Cars, Ltd.*, 387 F.Supp.2d 378, 382 (S.D. N.Y. 2005) ("costs not related to computer impairment or computer damages are not compensable").

The Complaint shows that defendants' alleged actions fall outside the scope of the Computer Fraud Act. "Plaintiffs allege Defendants violated the CFAA by deleting emails and other electronic data in order to conceal their misappropriation, use, and disclosure of PHFS's Confidential Information and Trade Secrets. Plaintiffs' allege to have incurred expenses in excess of $5,000.00 to investigate and remedy the damage caused by Narup's and Reuter's deletion." [Doc. 36 citing Doc. 20, Doc 97-1, ¶¶ 112-113].

Management Company claims it incurred $9,188.36 in investigative expenses. *SUMF 60. None of these expenses, however, were related to computer impairment or computer damage*. Deleted emails are not computer impairment or computer damage. *See Dewitt, supra*. The expenses claimed by Management Company were all related to its investigation of Narup's and Reuter's potential misappropriation of trade secrets. While misappropriation, if proved, is a cause of action, it is a different cause of action than that established by the Computer Fraud Act.

Of the total expenses claimed, more than half, $4,587.50, was paid to Stinson LLP, the law firm that formerly represented Management Company. Jim Bass, the Stinson lawyer on the case, testified that Stinson was investigating potential trade secret misappropriation: "there were concerns that Mr. Reuter and Mr. Narup had accessed and/or download or downloaded or copied information from the ... computers that went beyond their duties." *SUMF 61*.

> QUESTION:   So is it fair to say that the concern was essentially misappropriation or theft of trade secrets?
>
> ANSWER:   Yes, as well as, like I say, accessing those computers for improper purposes. Sort of a combination of the two.
>
> QUESTION:   Sure. Accessing the computers, the improper purpose would be to obtain trade secrets, confidential information for their own purposes?

ANSWER:    Correct.

*Id.* Bass did not attribute any of Stinson's legal fees to investigating ***damage to or impairment of a computer or computer system***. *Id.* Absent the fees paid to Stinson, the total claim by Management Company drops below the $5,000 required under the Computer Fraud Act to state a cause of action.

Management Company paid $1,500 to Moore Computing. *SUMF 62*. Moore Computing's owner testified, "the basic scope [of his assignment] was to make forensic images of three computers. And I also performed some basic keyword searches." *Id.* Moore confirmed that he did not analyze, and was not asked to analyze, whether the hard drives were impaired. *Id.* He did not conduct, and was not asked to conduct, any damage assessment. *Id.* He did not determine, and was not asked to determine, whether any information, documents, or data had been removed, deleted, or copied from the hard drives. *Id.* He was not asked to recover any deleted items. *Id.*

$216.36 is attributed to Management Company's employee, Cory McBride. McBride's only involvement with "devices" was to deliver hard drives to Moore Computing. *SUMF 63*. McBride's investigation also involved "creating search cases within eDiscovery, and filtering emails that were requested from Brian Stolz." *Id.* McBride testified that Narup's primary email archive was deleted. (Management Company alleges Narup deleted the archive. Narup denies this. *SUMF Exhibit 4 at ¶ 13*.) When asked how much of his investigation related to recovering deleted items, McBride responded, "zero." *SUMF 63*. In any case, his total time was valued at less than $220. *Id.*

Lastly, $2,884.50 of the purported investigative expenses was attributed to 30 hours of time spent by Stoltz to "pull and review Defendant Reuter's text messages from

Reuter's company phone; communicate with forensic expert Fred Moore; coordinate with Cory McBride regarding transporting forensic equipment and investigation of Narup's and Reuter's company email accounts; communicate with outside legal counsel at Stinson LLP; review contents of Narup's and Reuter's work computers, including but not limited to share drives and emails; and aid forensic search and review findings." *SUMF 64*. None of Stoltz's efforts related to computer or system impairment.

Thus, Management Company cannot show the $5,000 of expenses related to computer or system impairment required to establish a Computer Fraud claim.

Management Company alleges in further support of its Computer Fraud claim that it suffered lost profits "sustained by Plaintiffs as a result of Defendants' misappropriation and wrongful use or disclosure of [Management Company's] trade secrets." [Doc. 97-1 at 26]. These additional claimed damages fail because they, too, do not relate to computer or system impairment: the "potential loss of revenue resulting from their confidential and proprietary business information being shared with their competitors … is not a cognizable 'loss' under the CFAA." *Burnett*, 2014 U.S. Dist. LEXIS 192624, *6.

**3.** **SUMMARY JUDGMENT IS PROPER ON COUNTS 2 THROUGH 8 BECAUSE THE ALLEGED TRADE SECRETS ARE NOT RELATED TO PLAINTIFFS' CLAIMED DAMAGES.**

Plaintiffs claim defendants misappropriated plaintiffs' trade secrets. Oddly, the allegedly misappropriated trade secrets are wholly disconnected from plaintiffs' theories of liability and damages. Plaintiffs' alleged trade secrets relate to standard form documents used in their businesses and customizations made to the QFund software licensed to Management Company. *But plaintiffs do not allege they were damaged by defendants' alleged use of these form documents and software customizations.* Instead,

plaintiffs' damages relate **solely** to defendants' supposed fault in preventing or delaying plaintiffs in implementing QFund Omni Channel functionality in their loan stores.

*In short, the wrong alleged is that defendants got an unfair head-start in their business by stealing trade secrets, but the damages alleged relate to a supposed delay by plaintiffs in proceeding with their own business plans —* ***where there is no logical connection between the alleged head-start and the supposed delay***.

Omni Channel is not something that plaintiffs claim as a trade secret — and it isn't their trade secret. Even if plaintiffs were now to claim damages related to defendants' alleged use of plaintiffs' form documents and software customizations, something not claimed to date, summary judgment is still proper because none of the documents and software customizations are plaintiffs' trade secrets.

The purported trade secrets identified by plaintiffs are not trade secrets because they are either publicly available, have no independent economic value, were never in defendants' possession, or are described with such a lack of specificity as to make it impossible to identify the claimed trade secret.

"To establish a claim under both the Defend Trade Secrets Act of 2016 (DTSA) and the Missouri Uniform Trade Secrets Act (MUTSA), a plaintiff must show 1) that a protectable trade secret exists, 2) the defendant misappropriated the trade secret, and 3) damages." *Allstate Ins. Co. v. Head*, 2018 U.S. Dist. LEXIS 196341, *19 (W.D.Mo. 2018).

"The existence of a trade secret is a conclusion of law based on the applicable facts." *Am. Family Mut. Ins. Co. v. Mo. Dep't of Ins.*, 169 S.W.3d 905, 910 (Mo. App. 2005) (citation omitted). To be a trade secret, the owner must use reasonable efforts to maintain its secrecy. A trade secret must also derive independent economic value "from not being generally known to, and not being readily ascertainable by proper means by

21

others who can obtain economic value from the disclosure or use of the information." 18

U.S.C. § 1839 (3). Section 417.453(4), RSMo.

In their supplemental interrogatory answers, plaintiffs identify the following as the misappropriated "trade secrets": customer referral vouchers, customer privacy/ confidentiality policy, loan applications, employee handbook, standards for loan approval, RKZ Management storefront signage form, loan documents, loan management software, work product for operating online business, software upgrades, proprietary programming, customer data, EFT features, Transunion files, and title loan product. *SUMF 65*. Stoltz in his deposition was unable to identify any "trade secrets" other than those listed in plaintiffs' interrogatory answers. *SUMF 90*.

None of these items, however, are plaintiffs' trade secrets.

The "customer referral vouchers" are not trade secrets because they are not kept secret. Storefront Lenders "hand those out to customers" and "would want to give referral vouchers to our customers so they could refer us other customers." *SUMF 66*. Documents freely handed out to the public are not secrets.

The "Customer Privacy/Confidentiality Policy" was developed "to provide guidance and procedures to deal with privacy and confidentiality." *SUMF 67*. The policy informs Management Company employees that financial institutions need to safeguard customer information and explains how this should be done. The information contained is not secret and it does not have independent economic value. All financial institutions are required to have such policies to comply with regulations issued under the Gramm-Leach-Bliley Act. *See* 16 CFR § 314.3 It is no more secret and has no more independent economic value than a corporate policy informing employees not to discriminate on the

basis of race, sex, or handicap, or telling healthcare workers not to disclose a patient's information protected by HIPAA. *See* 45 CFR §164.530(c).

The loan application forms plaintiffs claim as trade secrets are not because they were also not kept secret. Instead, they were made "available to anyone who wants to come into a store who applies for a loan." *SUMF 68*. Internet Lender's loan application form is publicly accessible online. *Id*. Moreover, on the actual loan application forms that plaintiffs claim are their trade secrets, the only company identified is ACS. *Id*. Under plaintiffs' theory, if the forms were anyone's trade secrets, they were ACS's trade secrets. But they weren't. They are not anyone's trade secrets.

The acknowledgement page of Management Company's employee handbook states that the employee handbook belongs to the employee who signed the acknowledgement page. *SUMF 69*. Management Company contends that the entire employee handbook is confidential, but it contains the same generic information as almost any other employee handbook available out in the world. None of the information in the employee handbook has any economic value by virtue of not being widely known.

The "standards for loan approval" document is dated Dec. 2012. *SUMF 70*. According to Stoltz, Management Company's loan approval standards are "always under development ... these are definitely things that we're constantly working on developing." *Id*. An outdated document subject to constant development cannot be said to have any independent economic value to a Management Company that no longer uses it.

The "RKZ Management Storefront Signage Order Form" is a vendor form belonging to a company, RKZ Management, that is not a party to this lawsuit. *SUMF 71*. Every sign design shown is generic. One sign lists "store hours." *See SUMF Exhibit 33*. One says, "No Solicitation." One contains a telephone number. Moreover, the sign designs do

23

not get their value by being kept secret; their value comes *from being seen by the public*. The actual domain of intellectual property applicable to signage is not trade secret but trademark or possibly copyright. Plaintiffs have not, however, alleged any trademark or copyright claims with respect to these generic sign designs, and any such claims, if made, would be destined to fail.

Plaintiffs say "loan documents" consist of checks, loan agreements, a standard customer contract, and loan repayment options. *SUMF 72*. With the exception of the checks, ACS has copies of every one of these documents in every one of their customer loan files. *SUMF 73*. These documents were in the loan file of every loan sold to Reuter when he purchased ACS in 2014. *Id*. Stoltz confirmed that, "if [ACS] had a loan document with their customers, … regardless if they placed it into a loan file, I guess that would be their file, their loan." *Id*.

When asked what makes a check proprietary to Management Company, Stoltz testified: "I guess the design, the layout of the check that we paid QFund to customize for us." *SUMF 74*. Check designs are not trade secrets because they are made public, not kept secret. As with signs, the potential intellectual property claim for check design is trademark, not trade secret. In addition, checks are sometimes provided to customers, destroying any supposed secrecy for their design. *Id*.

There was also no secrecy maintained as to loan agreements, standard customer contracts, and loan repayment options. These documents were all freely distributed to customers and potential customers by Storefront Lenders. *SUMF 75*.

Trade secret claims relating to loan management software, work product for operating online business, software upgrades, and proprietary programming also all fail, albeit for different reasons. These claims all relate to QFund software. *SUMF 76*.

24

Plaintiffs acknowledge that loan management software "refers to QFund software." *Id.* Work Product for operating online business "refers to PHFS's work product with respect to its online platform. ... PHFS developed a business strategy regarding the implementation of their online platform (upon upgrade to QFund10), to effectively grow their store-front businesses by adding the ability for each store to reach out across the entire state. ... Plaintiffs allege Defendants misappropriated this strategy, and implemented it with ACS owned stores." *Id.* Software upgrades "refers to the upgrade from QFund to QFund10." *Id.* Proprietary programming "refers to the programming that made PHFS's version of the QFund software unique to PHFS." *Id.*

Plaintiffs do not contend that QFund is confidential or proprietary. *SUMF 77.*

Plaintiffs' description of their online business "work product" shows that what they describe is not a trade secret. *It is an **idea** to sell loans in stores and online.* The idea is not unique. It is not novel. It is generally known in every sector of the economy that one might make more sales if one sells one's products or services online as well as from a traditional retail storefront. One's intentions to expand one's business online using generally available licensed software has no independent economic value. It is not like one is designing the next Google, Amazon, or Facebook with one's own software. It is just someone opening yet another internet storefront using the same software many other people, including one's competitors, are using.

Management Company's real complaint is focused on what it views as its customized software programming and upgrades, things it thinks makes its installation of QFund unique and for which it paid fees to Virinchi to program and implement. While plaintiffs might feel defendants obtained an unfair head-start in creating their competing business because of their exposure to these customizations through Narup's and

Reuter's employment by Management Company, their feelings and the potential head-start do not by themselves establish that the customized programming and upgrades are Management Company's trade secrets. And, in fact, the undisputed evidence establishes that the customized programming and upgrades are *not* plaintiffs' trade secrets. Rather, *they belong to Virinchi*, the company that wrote, owns, and licenses the software.

> Article 2, Section II of Management Company's agreement with Virinchi states:
>
> b.     The Customer [Management Company] acknowledges that **Intellectual Property Rights for the QFund Applications reside with the Company** [Virinchi] and hence only the Company will perform any changes to the Base QFund applications for any integrations or interfacing or customization to accommodate such integration, interfacing or otherwise with any third party applications.
>
> Article 2, Section III of the license states:
>
> a.     As between Company and Customer, Customer shall retain all legal title, copyright and other proprietary rights **to any data or other information provided to Company**, entered into the Base QFund Applications by any of Customer's users or created by such applications as a result of such input. Company shall have no right of access to the data except solely for performance of its obligation hereunder.

*SUMF 78* (emphasis added).

Thus, *by contract*, the only aspect of QFund that is proprietary to plaintiffs is the data or other information entered into the QFund software, while the software itself and all modifications to the software remain proprietary to Virinchi.

Furthermore, for proprietary information to qualify as a trade secret, one must not be able to obtain the information by "proper means." While DTSA and MTSA do not define "proper means," they both define "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6); Section 417.453(1), RSMo.

26

Those are all wrongful acts. *There can be no dispute that licensing software from its publisher is, in contrast, a* **proper means** *of obtaining that software.*

Here, ACS told Virinchi that ACS was a separate company from Management Company. *SUMF 23, 24.* ACS asked to be upgraded to QFund10 and confirmed that QFund10 would include certain functions in its implementation. *SUMF 26, 27.* ACS signed a license agreement and paid an implementation fee. *SUMF 28.* Virinchi, QFund10's publisher, provided ACS a copy of the software. *Id.* Thus, ACS obtained QFund10 through proper means and there could be no trade secret violation.

Notably, during this case, plaintiffs asked Virinchi to sign an affidavit stating that the software upgrades were proprietary to Management Company and were not available to its competitors. *SUMF 79.* Virinchi refused to sign an affidavit making such statements because they were not factual. *Id.*

Finally, plaintiffs have not specified which QFund upgrades and customizations they claim are trade secrets. Instead, plaintiffs refer generally to 199 pages of "Change Requests" identifying customizations requested by Management Company. *SUMF 77.* According to Stoltz, "any work that we had done to QFund that changed that system would be a customization that we paid for that would be viewed as proprietary to us." *Id.* When asked to describe what made the customizations proprietary, Stoltz stated: "I mean it's all of the … it's all of the work that we put into QFund. Our formulas, our, our calculations, the design. I mean it's how, it's how we use QFund to aid us with our entire business." *Id.* "Again, it's, yeah, the change requests, it's the modifications that we made to the system, it's how we used the system, you know, formulas…" *Id.*

27

Courts routinely and properly reject trade secret claims that would require them to sift through multiple documents in search of trade secrets. They also reject claims based on nebulous descriptions such as, "it's how we use the system."

"To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist." *Inteliclear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (quotation marks and citation omitted). "Plaintiffs must clearly refer to tangible trade secret material instead of referring to a system which *potentially* qualifies for trade secret protection. Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." *Id.* (quotation marks and citation omitted).

The 7th Circuit rejected a similar attempt to make a trade secret claim in *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). There, the plaintiff asserted that, "a 43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package is specific enough." The Court succinctly responded:  "No, it isn't." *Id.*

> These 43 pages describe the software; although the document was created for this litigation, it does not separate the trade secrets from the other information that goes into any software package. Which aspects are known to the trade, and which are not? That's vital under the statutory definition. Likewise, IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets.

*Id.* at 584. The Court continued:

> [A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition. What is more, many of the items that appear in the 43-page description, such as the appearance of data-entry screens, are exceedingly hard to call trade secrets: things that any user or passer-by sees at a glance are "readily ascertainable by proper means". Perhaps screen displays could be copyrighted, but no copyright claim has been

advanced, and a trade-secret claim based on readily observable material is
a bust.

*Id.*, citing *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266
(7th Cir. 1992).

The Court in *NEXT Payment Solutions, Inc. v. CLEAResult Consulting, Inc.*,
2002 U.S. Dist. LEXIS 94764, *37-38 (N.D. Ill. 2020), granted summary judgment in a
DTSA case because, "Just like in *IDX Systems*, NEXT comes to the summary judgment
stage with an amorphous bog of alleged trade secrets. NEXT offers a broad description
that leaves the audience wondering what, exactly, the supposed trade secrets are. Trying
to pin down the trade secrets has the distinct feel of nailing jello to a wall."

In *Sutra, Inc. v. Ice. Express*, *EHF*, 2008 U.S. Dist. LEXIS 52849, *8-9 (D. Mass
2008), the Court rejected a trade secrets claim where the plaintiff asserted that, "its
trade secrets are 'the operation, appearance, features and functionality of the Control
Agent and Reservation Control interfaces and modules' of its AirKiosk System." The
Court held that "this description [is] far too open textured to meet the test for an identi-
fiable trade secret. A plaintiff has no cognizable trade secret claim until it has adequately
identified the specific trade secrets that are at issue." *Id.* at 9 (citation omitted).

Here, the proprietary programming and software upgrades plaintiffs assert are
trade secrets are quite simply not. It is impossible to tell from the "amorphous bog" of
change requests which are claimed to be trade secrets and which are not. For example,
the Change Requests document, *SUMF Exhibit 34* at 31 states: "All Loans Report revised
with new format." It appears to have had an excel sheet attached to it; that sheet was not
provided in discovery. But even if it were, nothing about this shows how a newly format-
ted loan report satisfies the legal definition of a trade secret. *SUMF Exhibit 34* at 41

references: "Accounts Receivable Aging Report." That's it. There is no attachment or further description. Trade secret or not? Not. *SUMF Exhibit 34* at 92 states: "Ability to reschedule ACH dates." Do the plaintiffs really want the Court to believe that the ability to reschedule an ACH transfer date is plaintiffs' trade secret? Do they contend that this ability was not known in the world before January 4, 2012? *Spoiler alert:* There's nothing special about rescheduling ACH dates.

The electronic funds transfer ("EFT") features, Transunion files, and title loan product plaintiffs claim as trade secrets are all *third-party feature*s that *any QFund licensed user* can choose to integrate into the software. *SUMF 80 - 83.*

According to plaintiffs, an email between Narup and Virinchi that references EFT integration "suggests that Defendants took the EFT integration and all of its features to Store 36 without paying for it." *SUMF 80*. When asked why plaintiffs claim the "EFT features" are proprietary, Stoltz testified, "that's customization of the software of how it handles, or its, its payment with electronic funds transfers." *Id*. Payment Processors, however, are publicly displayed on QFund's website and described as being "integration ready." *SUMF 81*. EFT functionality does not belong to the Management Company. It belongs to the world. Or, at least to Virinchi and all of its licensed users.

Plaintiffs support their claim that "Transunion files" are trade secrets by referencing an email where "Virinchi attaches a 'new version Transunion file in which [Virinchi] replaced RKZ with ACS.'" *SUMF 82*. Plaintiffs point specifically to the use of the same "Metro 2 format" in both the RKZ and the ACS Transunion files as evidence that plaintiffs' trade secret was misappropriated.

This is nonsense. All Transunion files use Transunion's standard "Metro 2 format." Stoltz agreed that "the Metro 2 format is standard." *Id*. The only thing that

30

differs between Transunion files using the standard Metro 2 format is the name and banking information of the customer company. *Id.* QFund's website identifies Transunion as one of many integration-ready financial companies and Stoltz admitted that all the companies listed on QFund's website are "companies that QFund is saying that they can connect to." *Id.* Unable to point to anything proprietary to their use of Transunion's own standard file format, Stoltz again retreated to his shibboleth that Management Company "paid to have customized and programmed our connection with TransUnion, or we paid QFund for that." *Id.* What was customized and programmed? Stoltz does not say and, of course, no part of the standard Metro 2 format was altered for Management Company. The file would not work if it was altered. Stoltz's testimony does not establish a trade secret. The email on which plaintiffs rely shows that Narup did not do anything wrong; Virinchi simply made him a copy of a widely-used, standard Transunion file.

Plaintiffs state, "the 'title loan product' refers to Virinchi's integration of the title loan product Blackbook into PHFS's version of the QFund software, and PHFS's calculation/underwriting formula for determining loan amounts." *SUMF 83.* "Black Book" is another integration-ready company identified on QFund's website. *Id.* According to Stoltz, "part of the customization of the QFund platform was to have them program into our system our formula for how we would use Black Book to create a valuation for an auto … a vehicle, and along with other inputs that we would put in, it would come out, it would derive a loan amount." *Id.* This vague description of an interaction with an integration-ready system is insufficient to support a trade secret claim, but the court does not need to even consider that issue because defendants did not request, and Virinchi did not provide them, Black Book integration. Defendants did not have access to or use Black Book integration once Narup and Reuter left their employment with

Management Company. *SUMF 84.* So, even if this commonplace software integration was the most secret and economically-impactful software ever, there is no genuine dispute that never took it or used it and it was therefore never misappropriated.

Finally, when asked to describe the "customer data" allegedly misappropriated, plaintiffs could not. Instead plaintiffs explained that they were simply suspicious: "Narup and Reuter had access to all of the PHFS's 'customer data' including customer lists. Given the correspondence that has been uncovered and produced, showing that Narup and Reuter took information from PHFS for use in operating ACS, Plaintiffs **suspect** that Narup and Reuter may have taken PHFS's customer data and customer lists, as well." *SUMF 85 (emphasis added).*

Plaintiffs have never presented any evidence to support their suspicion. Although plaintiffs possess the hard drives from Narup's and Reuter's computers from when the two men worked for Management Company, as well as Reuter's work phone and Narup's and Reuter's email accounts, plaintiffs have still not point to any evidence supporting their suspicion that a customer list was taken.

While a suspicion not backed by evidence might be enough to justify an allegation in a complaint, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007) (adopting plausibility standard for pleadings), it is not enough to withstand a motion for summary judgment. "Although a plaintiff can survive a motion to dismiss with plausible allegations, summary judgment can be avoided only by proffering evidence sufficient to create a material dispute of fact." *Ma v. Westinghouse Elec. Co., LLC*, 559 F. App'x 165, 171 (3d Cir. 2014). Narup and Reuter made it clear through their affidavits that they did not take any customer list from any plaintiff and that they made no efforts to solicit customers

they knew through their employment with Management Company. *SUMF 86*. These affidavits are unrebutted and thus these facts are not in genuine dispute.

### A. Plaintiffs did not take reasonable steps to protect the information they now claim to be confidential.

Reuter purchased ACS December 31, 2013, using non-party SJR Financial Services as the acquiring entity. *SUMF 8*. When Reuter took possession of the ACS location, copies of the Standards for Loan Approval and the RKZ Management Store-front Signage order form had been left there on site. *SUMF 87*.

When Reuter purchased ACS, ACS entered into a management agreement with Management Company. Under this agreement, ACS paid a monthly fee to Management Company in exchange for services such as bookkeeping, IT services (including use of QFund loan management and other software), human resources, marketing, and legal support. *SUMF 10, 19*. ACS also agreed to reimburse Management Company for all out-of-pocket expenses Management Company incurred on ACS's behalf. *SUMF 10*. This included ACS paying its pro rata share of every QFund invoice, including those invoices that included charges for change requests. *SUMF 20*.

Under the management agreement, Management Company provided ACS with copies of the Customer Privacy/Confidentiality Policy, the customer referral vouchers, loan applications, loan agreements (which included repayment options), and Management Company's employee handbook. Management Company also provided ACS with access to QFund with all of its forms and customizations. *SUMF 19, 88*.

The management agreement does not contain any confidentiality provisions. *See SUMF Exhibit 5*. ACS never signed a confidentiality agreement with plaintiffs. *SUMF 11*. After SJR Financial purchased ACS, all of the employees working at ACS's loan store

became ACS employees, with Reuter as ACS's manager being responsible for all employment decisions. *SUMF 12.* ACS did not require its employees to sign confidentiality agreements and there was nothing in the asset purchase or the management services agreements that required ACS employees to maintain the confidentiality of documents provided by Management Company. *SUMF 13 and SUMF Exhibits 2 and 5.*

**Management Company provided ACS and its employees with everything Management Company now claims to be a trade secret without imposing any obligation to maintain confidentiality.** Management Company did nothing to protect the secrecy of its supposed trade secrets. The 8th Circuit recently held in a DTSA case that when an employer "shared the relevant information with a third-party who had no obligation to keep it confidential," the employer "did not take reasonable steps to safeguard its trade secrets." *Farmers Edge Inc. v. Farmobile, LLC* 970 F.3d 1024, 1033 (8th Cir. 2020). As a result, there was "no secret to protect" and employer's case could not go forward. *Id.*

The same is true here. Management Company did not protect the supposed secrecy of its supposed trade secrets. Thus, plaintiffs have no trade secrets to protect. Summary judgment should be granted on Counts 2 through 8 for this additional reason.

**4.   NARUP AND REUTER DID NOT BREACH ANY DUTY OF LOYALTY TO THEIR EMPLOYER, MANAGEMENT COMPANY, BECAUSE THEY DID NOT AND DO NOT COMPETE WITH MANAGEMENT COMPANY.**

Plaintiffs allege Narup and Reuter breached a duty of loyalty owed to Management Company because, "During the term of their employment ... Defendants Narup and S. Reuter acted in direct competition with Plaintiffs." [Doc. 197-1, pg. 31]. Narup and Reuter were not employed by any plaintiff other than Management Company, and

thus did not owe loyalty to any other plaintiff. Narup and Reuter did not compete with Management Company. Thus, Narup and Reuter did not breach their duty of loyalty.[5]

Narup and Reuter "were W-2 employees of [Management Company]." *SUMF 14.* Narup's employment with Management Company ended October 5, 2018. *Id.* Reuter's employment with Management Company ended November 2, 2018. *Id.* Narup and Reuter were not W-2 employees of any other plaintiff. *SUMF 15.*

Management Company provides "human resources services, accounting services, payroll services, and information technology services, including loan management software" to companies that offer financial services to customers in the short-term loan industry. *SUMF 3. Management Company exists to provide management services to loan stores,* chiefly those owned by Storefront Lenders and Internet Lender. *Id.* Each loan store pays Management Company $2,750 per month for management services. *SUMF 7.* Management Company does not make consumer installment or payday loans. *SUMF 4.*

The stores operated by ACS and ACSM-II do not provide management services. They are in the business of making installment loans to consumers. That is all they do. They do not compete with Management Company. *SUMF 9.*[6]

"A breach of the duty of loyalty arises when the employee goes beyond the mere planning and preparation and actually engages in direct competition." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 959 (8th Cir. 2007) (citation omitted).

> [A] proper definitional instruction of the duty of loyalty … must set out the following elements: 1) In general, an employee must not, while employed,

---

[5]     This ground for granting summary judgment is in addition to the ground of absence of damages discussed above.

[6]     American Credit Services Management, LLC, which was sold to Reuter in connection with Reuter's purchase of ACS, is not an operating entity and has never been used by Reuter for any purpose. *SUMF 9.*

act contrary to the employer's interest; 2) however, an employee may agree with others to compete upon termination of the employment and may plan and prepare for their competing enterprise while still employed; and 3) but an employee may not, while still employed, go beyond mere planning and preparation and act in direct competition with the employer.

*Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 481 (Mo. 2005). Employee actions that are contrary to an employer's interest do not breach the duty of loyalty if those actions are not done in direct competition with the employer. *Gustafson v. Full Service Maintenance Corp.*, 2012 U.S. Dist LEXIS 27903 *3-7 (E.D. Mo. 2012).

Narup and Reuter owed a duty of loyalty to Management Company. They owed no duty to the other plaintiffs. Because the loan stores owned and operated by ACS and ACSM-II do not compete with Management Company, Narup and Reuter could not breach their duty of loyalty even if their stores began lending operations while Narup and Reuter were still employed by Management Company.

An argument similar to that made by plaintiffs was rejected in *Coonrod v. Archer-Daniels-Midland Co*., 984 S.W.2d 529 (Mo. App. 1998). There, plaintiff sought to impose a duty on a corporate parent company for the actions of its subsidiary's employees "based on the fact [parent company] handles the payroll functions of its subsidiary, Defendant Milling." *Id.* at 534-535. The court in rejecting this argument stated it could not find a single case "holding that where a parent corporation handles the payroll functions for its subsidiary corporation's employees, the parent company is then considered the employer of those employees." *Id.*

*JTL Consulting, L.L.C. v. Shanahan*, 190 S.W.3d 389, 392 (Mo. App. 2006), involved a lawsuit brought by Lockton, an "insurance brokerage firm that was in the business of providing insurance products and services" and JTL Consulting, LLC ("JTL"), a company whose "members worked as sales representatives ... for Lockton's

36

products and services," against Shanahan, a JTL member. JTL's operating agreement included a non-solicitation clause prohibiting former members from soliciting JTL's customers. JTL sought to enforce this clause against Shanahan. *Id.* The difficulty in its case was that JTL itself *had no insurance customers. Id.* at 397. JTL's customer was Lockton and JTL's members worked at creating customer relationships between Lockton, which was selling insurance products and services, and Lockton's customers. *Id.*

The Court acknowledged that "JTL's members have a close and valuable contact with Lockton's customers." *Id.* Nevertheless, "JTL's business is not to sell products directly to customers, but to obtain customers for Lockton." *Id.* at 398. "The fact that JTL received a stream of revenue from Lockton for providing services to Lockton's customers does not give it a protectable interest in those customers." *Id.* Therefore, the restrictive covenant in JTL's operating agreement was not enforceable against Shanahan. *Id.* at 398-399.

In *Federal Insurance Company v. Parello*, 767 F.Supp. 157, 160 (N.D. Ill. 1991), the court similarly held that because parent companies and their subsidiaries are separate and distinct legal entities, the employee of a subsidiary company does not owe a fiduciary duty to the parent company.

Management Company provides management services to Storefront Lenders and Internet Lender in exchange for a management fee. While Management Company has an interest in the success of Storefront Lenders and Internet Lender, and thus in their relationships with their customers, that does not turn Storefront Lenders' customers and Internet Lender's customers into Management Company's customers. Management Company is not in the business of making loans and the fact that it provides services to those who do does not put it in the same business as them.

Narup's and Reuter's Confidentiality Agreements define "Customer" as "any person who entered into a loan through the Company ..." *SUMF 16*. "Company" is defined as "PH Financial Services, LLC." *Id*. No one entered into a loan through *that* company. *SUMF 4*. Thus, under the express terms of the Confidentiality Agreements, there are no Customers to whom the Confidentiality Agreements apply.

Finally, while Holding Company and Storefront Lenders contend that they are assignees of the Confidentiality Agreements, the court has already held that even if there has been an assignment, "Narup and Reuter's *obligations* under the Agreements do not change; the number and identities of the 'Customers' whom they may not solicit under the Agreements is in no way tied to the number of entities possessing the contractual power to enforce the Agreements against them." [Doc. 87, pgs. 8-9].

Thus, the duties owed by Narup and Reuter under their agreements are limited to customers who received loans from the Management Company, of whom there are none. The alleged assignment of the agreements did not create a new duty owed by Narup and Reuter to Storefront Lenders and Internet Lender with respect to their separate customers. Storefront Lenders and Internet Lender can, at most, enforce the duties Narup and Reuter already owe to Management Company.

**5.   PLAINTIFFS CANNOT MAKE THEIR TORTIOUS INTERFERENCE CLAIMS BECAUSE DEFENDANTS DID NOT KNOW ABOUT EACH OTHER'S CONFIDENTIALITY AGREEMENTS WITH MANAGEMENT COMPANY AND THERE IS NO EVIDENCE OF IMPROPER MEANS.**

A claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and, (5) damages resulting from defendant's conduct.

*Community Title Co*., 796 S.W.2d at 372.

38

"The plaintiff carries the burden of proof and is required to proffer substantial evidence supporting each and every element; if the plaintiff fails to establish substantial evidence of any one element, the plaintiff's claim for tortious interference fails." *Hibbs v. Berger*, 430 S.W.3d 296, 317 (Mo. App. 2014).

"[P]laintiffs must allege and prove in all tortious interference cases that the defendant employed improper means." *Clinch v. Heartland Health* , 187 S.W.3d 10, 16 (Mo. App. 2006). There is an absence of justification to use improper means. "Improper means, for purposes of intentional interference with contractual relations or business expectancy, are those means which are *independently wrongful*, notwithstanding injury caused by the interference." *Community Title Co.*, 796 S.W.2d at 373 (emphasis added). To be improper, the means must involve "misrepresentation of fact, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law." *Id.*

### A.    Tortious Interference with Contract.

Plaintiffs allege defendants tortiously interfered with Narup's and Reuter's Confidentiality Agreements with Management Company, "by permitting and encouraging Defendants Narup and S. Reuter to use and disclosure (sic) PHFS's Confidential Information and Trade Secrets." [Doc. 97-1, ¶ 171].

Neither Narup nor Stephen Reuter knew the other signed a Confidentiality Agreement in their employment with Management Company. *SUMF 91*. Narup and Reuter never discussed each other's agreements with Management Company while employed by Management Company. *SUMF 92*. The undisputed facts show Narup and Reuter did not know about the other's contractual relationship with Management Company.

Christine Reuter did not know that Narup or Stephen Reuter had signed confidentiality agreements. *SUMF 98*. Before this lawsuit was filed, she had never seen the agreements and had no knowledge of the allegedly confidential information and trade secrets identified in plaintiffs' Complaint. *Id.*

Knowledge of a contractual relationship is a necessary element of any tortious interference with contract claim. The undisputed evidence establishes that no defendant knew that any other defendant signed a Confidentiality Agreement. Plaintiffs, therefore, cannot make a jury-submissible claim of tortious interference with contract.

Further, Management Company was the contracting plaintiff; the other plaintiffs claim to be third-party beneficiaries to the Confidentiality Agreements. [Doc. 97-1, ¶168]. "To be bound as a third-party beneficiary, the terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member." *Verni v. Cleveland Chiropractic College*, 212 S.W.3d 150, 153 (Mo. 2007) (quotations, citations omitted). "In cases where the contract lacks an express declaration of that intent, there is a strong presumption that the third party is not a beneficiary and that the parties contracted to benefit only themselves." *Id.*

Here, the Confidentiality Agreements express no intent to benefit any other party. Thus, plaintiffs, with the exception of Management Company, are not proper plaintiffs to assert a tortious interference with contract claim.

### B.    Tortious Interference with Business Expectancy.

Plaintiffs allege, "Defendants Narup and S. Reuter intentionally and without justification interfered with PHFS and VTL's business relationship by directing VTL to convert Store 36 prior to QFund10 prior to converting Store 26." [Doc. 97-1, ¶ 177].

Reuter first informed Virinchi November 21, 2017 that ACS was owned by Reuter independent of Management Company and the other plaintiffs. *SUMF 23*. Throughout 2018, Narup repeatedly reminded Virinchi that ACS was an independently owned company. *SUMF 93*. Management Company decided to upgrade to QFund10 in "early 2018." *SUMF 25*. Thus, Virinchi knew that ACS was an independent company before Management Company decided to upgrade to QFund10.

Management Company began the QFund10 conversion process April 2, 2018. *Id*. Reuter informed Virinchi in April 2018 that he also wanted to upgrade to QFund10 at ACS's loan store. *SUMF 26*.

Narup emailed Virinchi May 9, 2018, copying Stoltz, stating: "Just wanted to reach out and see what the status of the Q10 implementation is for the PH Financial Stores now that we have given your team our rollout schedule." *SUMF 29*. Stoltz responded, asking Virinchi's employee to reach out directly to him, "so we may discuss." *SUMF 30*. Virinchi responded, informing Stoltz, "we have setup the instance locally and configuring the product for NM." *Id*.

Stoltz testified that his emails with Virinchi "tells me that they are working through the plan, which makes me think that the rollout plan that I had directed to take place was being done." *SUMF 31*. "So once I got the update from Vikram that they were, to me they're clearly working on New Mexico so that my plan that I directed to be put into place was then being worked on." *Id*.

Narup did not tell anyone at Virinchi to stop working on Management Company's QFund10 upgrade after Virinchi told Stoltz that "they are working through the plan," on May 9. *SUMF 32*. Reuter had no communications with Virinchi about Management Company's planned QFund10 upgrade. *SUMF 33*.

Management Company's "plan that [Stoltz] directed to be put into place" was being pursued as of May 9, 2018. Neither Narup nor Reuter did anything to derail that plan at any point on or after May 9, 2018. Narup and Reuter did not use any improper means and plaintiffs, therefore, cannot prove this necessary element of their claim of tortious interference with a business expectancy.

**6.    PLAINTIFFS' CONVERSION CLAIM FAILS BECAUSE PLAINTIFFS HAVE NOT BEEN DEPRIVED OF POSSESSION OF ANY PROPERTY.**

A claim for conversion must prove the following three elements: "(1) plaintiff was the owner of the property or entitled to its possession; (2) defendant took possession of the property with the intent to exercise some control over it; and (3) defendant thereby deprived plaintiff of the right to possession." *JEP Enters., Inc. v. Wehrenberg, Inc.*, 42 S.W.3d 773, 776 (Mo. App. 2001).

This court has previously held: "Any method of proving conversion requires a showing of actual deprivation of the plaintiff's possession or control of its property." [Doc. #50, pgs. 15-16]. The court further held "that Plaintiffs' claim for conversion survives only to the extent it alleges conversion of the QFund Software with modifications made at PHFS's expense and any other documents or material taken and retained *to which Plaintiffs no longer have access*" (emphasis added).

Plaintiffs were asked in interrogatories to, "Identify all documents, materials, or information any plaintiff alleges were taken and retained by any defendant to which plaintiffs no longer have access as a result of any defendants' actions." *SUMF 89*. Plaintiffs responded: "none." *Id.* Stoltz further testified that plaintiffs are still using QFund today. *SUMF 21*. Although plaintiffs say they do not have QFund10 with Omni Channel capabilities in all of their storefronts, and blame this situation on Narup and Reuter, in

fact Virinchi owns QFund and QFund10 and both applications are available with or without Omni Channel to anyone willing to pay the license fee.

Simply put, there is nothing that any plaintiff once possessed that that plaintiff no longer possesses or has control of because of the actions of any defendant.

### 7.      RN FINANCIAL IS NOT A PROPER DEFENDANT.

RN Financial is entitled to summary judgment for the reasons stated above. RN Financial is also entitled to summary judgment because: 1) the event on which plaintiffs' sole theory of damages is based — the alleged QFund10 diversion — happened *two years* before RN Financial came into existence; and 2) RN Financial has never used QFund or any of the items plaintiffs claim to have been misappropriated.

Plaintiffs claim they were damaged because *in 2018*, "the installation of QFund10 software into Plaintiffs' stores was delayed due to the actions of defendants." *SUMF 38*. RN Financial, however, did not come into existence until April 28, 2020. *SUMF 93*. Thus, it was impossible for RN Financial to have caused or contributed to cause the only harm plaintiffs claim to have suffered.

Next, RN Financial has never used plaintiffs' alleged trade secrets. The loan management software, work product for operating an online business, software upgrades, proprietary programming, EFT features, Transunion files, and title loan product which plaintiffs claim were misappropriated all relate to QFund or QFund10. *SUMF 77-84*. RN Financial, however, has never used or had access to QFund or QFund10. *SUMF 94*. Thus, it could not have misappropriated these items.

Plaintiffs' customer referral vouchers, customer privacy/confidentiality policy, loan applications, employee handbook, standards for loan approval, and the RKZ Management storefront signage form were all returned to plaintiffs September 6, 2019,

before RN Financial was formed. *SUMF 95*. RN Financial does not use checks in connection with making loans. RN Financial's loan agreement was prepared for ACS by its attorney at the Husch Blackwell. *SUMF 96*.

Finally, the only loan management software that RN Financial has ever used  is the software manufactured by Infinity. *SUMF 94*. While Internet Lender uses Infinity, Internet Lender does not own any modifications or improvements Infinity made on Internet Lender's behalf. *SUMF 97*.

RN Financial did not take the QFund10 upgrade from plaintiffs in 2018 because RN Financial did not exist in 2018 and has never used QFund10. RN Financial has never used or possessed any of plaintiffs' alleged trade secrets. Summary judgment should be entered for RN Financial on all claims asserted against it.

## 8.   CHRISTINE REUTER IS NOT A PROPER DEFENDANT.

It appears plaintiffs sued Christine Reuter solely to harass her and her husband, defendant Reuter. Plaintiffs do not allege any facts purporting to show misconduct by her, instead making allegations only "upon information and belief." [Doc. 97-1]. Christine Reuter has no knowledge of any of the allegations in the complaint. *SUMF 98*. She did not acquire, use, or disclose any of the alleged confidential information or trade secrets. She had no discussions with anyone about any of the wrongdoing alleged. *Id*. She never used QFund or QFund10. *Id*. Her sole connection with the business is that she guaranteed her husband's lease on a store at the landlord's request. *Id*. This guarantee is not alleged in the Complaint and would not be actionable if it had been. Summary judgment should be entered for Christine Reuter on all claims asserted against her.

**9.    PLAINTIFFS' CIVIL CONSPIRACY CLAIM FAILS BECAUSE THERE WAS NO UNDERLYING UNLAWFUL ACT.**

Count 10 of plaintiffs' complaint alleges a civil conspiracy. In Missouri:

A "civil conspiracy" is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act. A conspiracy is not actionable in its own right because it does not exist apart from the statement of an underlying claim. The unlawful acts done in pursuit of a conspiracy give rise to the action. ... If the unlawful acts alleged to be an element of the conspiracy fail as a matter of law then so does the claim for conspiracy.

*Dueker v. Gill*, 175 S.W.3d 662, 673 (Mo. App. 2005) (internal citations omitted).

As demonstrated above, the undisputed facts establish that defendants are entitled to summary judgment on the underlying claims that are the foundation for the conspiracy claim. Since plaintiffs cannot prove an underlying unlawful act, Count 10 fails as a matter of law and summary judgment should be granted on this count as well.

## CONCLUSION

Summary judgment should be granted in favor of every defendant on every count in the Complaint.

Respectfully submitted,
JACOBSON PRESS P.C.

/s/ Matt Vianello
Matthew B. Vianello, #63303 MO
Joe D. Jacobson, #33715 MO
222 S. Central Ave., Suite 550
Clayton, Missouri 63105
Tel: (314) 899-9789
Fax: (314) 899-0282
Vianello@ArchCityLawyers.com
Jacobson@ArchCityLawyers.com
*Attorneys for Defendants*

CERTIFICATE OF SERVICE

The filing attorney certifies that a true and accurate copy of the foregoing was served on all parties of record via the Court's e-filing system.