**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PINEBROOK HOLDINGS, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-1562-MTS |
| | ) | |
| AARON NARUP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment, Doc. [148], pursuant to Federal Rule of Civil Procedure 56, on all ten counts in Plaintiffs' Second Amended Complaint, Doc. [97-1]. For reasons discussed herein, the Court grants limited summary judgment: summary judgment on Count I, partial summary judgment on Count VI, and denies summary judgment on all other counts.

The Court begins by briefly summarizing the gist of Plaintiffs' claims and introducing some of the characters pertinent to this saga. Seventeen named entities and individuals make up the parties to this suit, which involve employment relationships, familial relationships, corporate relationships, and business relationships—to name just a few.[1] The case arises out of the conduct of Defendant Steve Reuter ("Reuter") and Defendant Aaron Narup ("Narup"), who were both trusted employees of Plaintiff PH Financial Services, LLC ("PHFS"), a wholly-owned subsidiary of Plaintiff Pinebrook Holdings, LLC ("Pinebrook"), which itself is owned by Bob Zeitler ("Zeitler"). Pinebrook operates all the other Plaintiff entities, which are engaged in the business of marketing, selling, and providing financial services in the short-term loan industry. Plaintiffs

---

[1] Of the combined 17 named parties in this case, 14 are different limited liability companies.

claim that Reuter plotted and schemed to advance the interests of his own loan store, Defendants American Credit Services, LLC and American Credit Service Management, LLC ("Store 36"), and then opened a second competing loan store, Defendant American Credit Services Management II, LLC ("Store 37"), while still on PHFS's payroll.[2]  Reuter allegedly devoted time (paid by PHFS) and other Pinebrook resources to pursue personal opportunities, and solicited the help of PHFS's IT Manager, Narup.  Together, Plaintiffs claim, Narup and Reuter misappropriated Plaintiffs' overall business plans, strategies, and materials and usurped business opportunities, all to improve the productivity of Reuter's loan store (Store 36) and to open a new loan store (Store 37).  Stores 36 and 37 make installment loans to customers, just like the majority of the Plaintiff companies. To make matters more complicated, Reuter is Zeitler's brother-in-law; Christine Reuter ("Christine")—another named Defendant—and Zeitler's wife are sisters.

The Court points to the number of disputed facts between the parties as further evidence that summary judgment is inappropriate.  Of the parties combined 166 material facts, almost half are disputed.[3]  Doc. [155]; Doc. [161].  There is even a dispute as to who owns and operates several of the Plaintiff and Defendant companies, of which fourteen are named in this case.  *See, e.g.*, Doc. [161] ¶¶ 1, 14, 35, 52.  The parties briefing also demonstrates why summary judgment is inappropriate.  At many times, there is minimal case law and bald conclusions of law lacking meaningful analysis, despite over 120 pages of briefing between the parties.  This is especially notable given that it is Defendants' burden, as the moving party, to show it is "entitled to judgment as a matter of law."  *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  It is quite difficult to demonstrate a party is entitled to judgment as a matter of law where

---

[2] Defendants American Credit Services, LLC and American Credit Service Management, LLC own/operate Store 36. Defendant American Credit Services Management II, LLC owns and operates Store 37.
[3] Notably, Defendants dispute 49 of Plaintiffs' 68 facts.  Doc. [161].

the party provides no law or law only supporting broad, rudimentary concepts.  Moreover, rather than identifying "those portions of the record that demonstrate the absence of a genuine issue of material fact," *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011), Defendants use clearly disputed facts to try to prove their claim and at other times, use an overinclusive approach that is contrary to either the facts of the case or the law, or both.  Neither method is persuasive to the Court.

With all of this in mind, the Court provides a more detailed background and begins its analysis.

## I.   BACKGROUND

The Court reiterates the number of disputed facts but seeks to provide a general overview of the facts pertinent to the substantive claims discussed below and, in a manner, consistent with the Court's obligation on summary judgment.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (explaining the court views any genuine factual disputes in the light most favorable to the nonmoving party).

Pinebrook operates (and may solely own) all other Plaintiff entities.  These include Plaintiffs St. Louis Financial Group, LLC, West Coast Premier Financial, LLC, Los Angeles Financial Group, LLC, Louisiana Financial Group, LLC, California Financial Group, LLC, Pacific Cash Advance, LLC, and Flexible Finance of Wisconsin, LLC (collectively, "Store Lenders") and Danridge Holdings, LLC ("Internet Lender") (all collectively, "Pinebrook Lenders").  The Pinebrook Lenders offer short-term loan products and services to customers.  Store Lenders sell loans to customers via 36 brick-and-mortar locations in ten states and Internet Lender offers the same via the internet in ten states.  Under Pinebrook's umbrella of companies is also PHFS, which provides shared-support services to Pinebrook Lenders.  These management services include

human resources services, accounting, payroll, and information technology services, including loan management software.  PHFS does not make loans of any type to customers.

PHFS hired Reuter and Narup in 2011 and 2012, respectively.  Each of them subsequently signed identical confidentiality and non-solicitation agreements ( "Confidentiality Agreement") in December 2013.  Docs. [150-6]; [150-7].  Prior to his resignation from PHFS, Narup served as the IT Administrative Supervisor and Portfolio Manager and was responsible for, among other things, managing Pinebrook's online portfolio, implementing and managing PHFS's online loan management system, and managing technology systems and loan software programs.  At the time of his termination from PHFS, Reuter held the positions of Store Maintenance Manager and Title Loan Specialist and was responsible for, among other things, marketing, selling, and collecting on financial products sold by the Store Lenders.  In these positions, Narup and Reuter were privy to and became well acquainted with Plaintiffs' confidential information, customers, and vendors, and with Plaintiffs' needs and future plans, as well as with all secret methods and processes used by Pinebrook Lenders in the conduct of their business.

In December 2013, Pinebrook sold Store 36 to Reuter.  Store 36, like Store Lenders, offer short-term loan products to customers.  Store 36 entered into a management services agreement ("MSA") with PHFS, under which Store 36 paid a monthly management fee to PHFS in exchange for management services, Doc. [150-5], like the services PHFS provides to Pinebrook Lenders.  Store 36 became the *only* non-Pinebrook-owned store operating under the PHFS umbrella.  While the MSA was in effect,[4] Plaintiffs allowed Store 36 access to some PHFS materials and loan management software, which later would include Plaintiffs' modified version of QFund software.

---

[4] The MSA was in effect from January 1, 2014 to October 31, 2018.

PHFS contracted with Virinchi Technologies Limited ("Virinchi") to supply loan management software, including Virinchi's QFund loan software product.  The base QFund software is publicly available for purchase.  Upon purchase of the baseline software, customers of Virinchi, such as Plaintiffs, customize QFund to function in a way that is tailored specific to their business model.  PHFS has spent substantial time and money to modify the QFund Software for its specific business purposes.[5]  PHFS provides QFund to Store Lenders in their business of selling loans.

In early 2018, PHFS decided to upgrade QFund to QFund10, which would allow Store Lenders to service loans simultaneously in person *and* online.  Prior to the upgrade, Store Lenders were only capable of servicing loans in person at storefront locations.  According to Plaintiffs, without the QFund10 upgrade, Store Lenders would be unable to also service loans online.  The rollout plan was scheduled to complete full upgrades of Store Lenders by the end of 2018, beginning the upgrade on just one Store Lender at first and based on those results, implementing the upgrade at a greater pace.  Store Lender Store 26 ("Store 26") was planned to be the first upgraded.

In his role as a PHFS employee, Narup was responsible for facilitating the conversion to QFund10 in Store Lenders.  Using his PHFS email, Narup sent an email to Virinchi on April 25, 2018, directing Virinchi to "*only* focus on converting Store 36 over to QFund10."  Doc. [156-14] at 2–3.  It is undisputed that Narup took no action, as of this date, or at any point in the future, to convert Store 26 to QFund10.  Doc. [161] ¶ 29.

From April 2018 to November 2018, there is evidence Narup and Reuter regularly communicated about taking Plaintiffs' materials, information, business plan, vendors, and more.

---

[5] Plaintiffs claim their customized versions of QFund are protected trade secrets.

Also, during this time, Narup and Reuter regularly communicated about finding a location for a new loan store—Store 37.  Store 37 was to operate similarly to Store 36 and the Store Lenders.  It is undisputed that Reuter's call history revealed he spent significant time managing Store 36 and Store 37 during his regular business hours with PHFS.  Doc. [161] ¶ 44.

In September 2018, Reuter signed a lease for Store 37 and Narup signed an employment agreement with Store 37.  Later that month, Narup submitted his resignation letter to PHFS, and his final day of employment was set to be October 5, 2018.[6]  In his letter, Narup falsely stated that he was leaving PHFS to work at a construction company.  On the date Narup left employment with PHFS, he had done no substantial work to convert Store 26 to QFund10.  On October 11, 2018, Narup sent an e-mail to Virinchi, requesting QFund be set up for Store 37.  Store 37, unlike Store 36, did not have access to QFund or any PHFS materials.[7]  On November 2, 2018, PHFS terminated Reuter.  That same day, counsel for PHFS sent correspondence to Narup and Reuter reminding them of their obligations under the Confidentiality Agreement they signed with PHFS.  Doc. [156-26].  In April 2020, Narup and Reuter formed Defendant RN Financial, LLC, which is an online loan business.

Based on the foregoing, Pinebrook, Pinebrook Lenders, and PHFS filed a ten-count complaint against Narup, Reuter, Christine, Store 36, Store 37, and RN Financial.  In their  Second Amended Complaint ("Complaint"), Plaintiffs assert the following ten causes of action for monetary, injunctive, and other relief: violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030, *et seq.* (Count I); violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1833, *et seq.* (Count II); violation of the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. § 417.450, *et seq.* (Count III); breach of the duty of loyalty (Count IV); breach of contract

---

[6] On September 25, 2018, Store 36 was finally ready to "go live" with QFund10.
[7] On November 14, 2018, Virinchi provided Store 36 with a license to use QFund10.

(Count V); tortious interference with a contract (Count VI); tortious interference with a business expectancy (Count VII); unjust enrichment (Count VIII); conversion (Count IX); and civil conspiracy (Count X).   Doc. [97-1].   In the current Motion, Defendants move for summary judgment on all ten-counts.   Doc. [148].

## II.   STANDARD

"A court must grant a motion for summary judgment if the moving party shows that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law." *Bedford*, 880 F.3d at 996 (citing Fed. R. Civ. P. 56(a)).   The movant bears the initial burden of explaining the basis for its motion, and it must identify those portions of the record that demonstrate the absence of a genuine issue of material fact.   *Torgerson*, 643 F.3d at 1042.   "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment."   *Thomas v. Corwin*, 483 F.3d 516, 526–27 (8th Cir. 2007).   If the nonmoving party fails to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof, the moving party is "entitled to a judgment as a matter of law."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The court views any factual disputes in the light most favorable to the nonmoving party.   *Scott*, 550 U.S. at 380.

## III.   DISCUSSION

The Court first addresses Defendants' argument that several parties are entitled to summary judgment because they are not "proper" parties to the case.   Doc. [149] at 43–44, 6.

First, Defendants argue that Christine Reuter is not a "proper" defendant. Essentially, Defendants argue that two specific pieces of evidence that implicate Christine do not suffice as enough evidence of her involvement such that she is not a "proper" defendant and is entitled to summary judgment. The Court disagrees because there is "evidence on which the jury could reasonably find" Christine is involved to some degree. *Anderson*, 477 U.S. at 252. Perhaps, Christine is not a proper party to *some* counts, but Defendants do not make this individualized argument. The Court rejects their one-size-fits-all approach.[8]

Next, Defendants argue that RN Financial is not a "proper" defendant. Essentially, Defendants argue that because RN Financial was not in existence during the time of Defendants alleged wrongful conduct that it is absolved from liability. Defendants cite no law that supports their argument—that some sort of amnesty from misappropriation comes from the passage of time thus making its later usage of misappropriated materials is okay. The Court does not find such argument availing. *Cf. Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1057 (8th Cir. 2014) (finding passage of time did not deprive trade secrets of economic value).

Finally, Defendants argue that PHFS and Internet Lender are not "proper" plaintiffs because the entities suffered no damages.[9] Defendants' case law on this point is scant, and their briefing lacks meaningful analysis. Moreover, there are disputes as to the relationship between Pinebrook, Pinebrook Lenders, and PHFS, see, e.g., Doc. [161] ¶ 1, including how the revenue and profits flow between the entities, the amount of control the parent, sister, and subsidiary

---

[8] The Court notes that Defendants do address Christine's specific lack of liability as to *one* count.

[9] Defendants' argument conflicts with the pleadings, as PHFS alleges specific damages to itself, such as damages from a CFAA violation. Further, Defendants' argument is contrary to Defendants' *own* argument in Count VI where Defendants assert that no Plaintiff (*other than PHFS*) has standing to pursue tortious interference with contract because PHFS was the only Plaintiff party to Narup's and Reuter's Confidentiality Agreements.

companies have over one another, and whether the corporations operate as a single business with "unity" or as strictly separate distinct entities.

### A. **Duty of Loyalty**

In Count IV, Plaintiffs allege Narup and Reuter breached a duty of loyalty because while the two were employed by PHFS they acted contrary to PHFS's interests and opened a competing business. Under Missouri law, every employee owes his or her employer a duty of loyalty. *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 15 (Mo. banc 2012). This duty is "well settled" in that while employed, the employee should not "act contrary to the employer's interests." *Nat'l Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 41 (Mo. banc 1966). A breach of the duty of loyalty arises when the "employee goes beyond the mere planning and preparation and actually engages in direct competition, which by definition, is to gain advantage over a competitor." *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 479 (Mo. banc 2005). *Without citing to any case law or legal authority*, Defendants argue that Narup and Reuter did not act in "direct competition" with PHFS. Defendants' theory is contrary to both the facts in this case and Missouri case law.

Defendants point to no legal authority to define "direct competition" to exclude their conduct nor provide any factually analogous cases to show why Defendants did not compete with PHFS. Rather, Defendants nakedly conclude that there is no "direct competition," *as a matter of law*, because PHFS (the Plaintiff-company for which Narup and Reuter worked) is not in the business of selling loans to customers whereas Stores 36 and 37 (Defendants' business) sell loans directly to customers. Defendants provide a distinction without a difference. Stores 36 and 37 sell loans directly to customers, just as Store Lenders do. PHFS exists solely to service Store Lenders; PHFS works with Store Lenders, its sister companies, to sell loans to customers. It is nonsensical

that there is no "direct competition" just because PHFS is not *the* entity actually selling the loans to the customers.  This is especially true, here, where based on PHFS's role in enabling Store Lenders to service loans, PHFS in turn, maintains a significant amount of confidential information regarding Pinebrook, Internet Lender, Store Lenders, and the Store Lenders' customers, vendors, and products.  Narup and Reuter had access to this unique and confidential information—*in their roles as PHFS employees*—and used it to Store 36's advantage and to form Store 37, stores that directly sell loans in competition with Store Lenders.  Thus, the Court cannot say, as a matter of law, that Narup and Reuter did not use their employment at PHFS to gain a business advantage over a competitor.[10]  *Scanwell*, 162 S.W.3d at 479.

The record further illuminates why Defendants' argument is wholly unpersuasive.  There is evidence Reuter solicited Narup to leave his employment with PHFS while both were still employed by PHFS, and both were subject to a non-solicitation clause.  There is also evidence Narup and Reuter exploited their positions within PHFS for their own personal benefits, prepared for Stores 36 and 37 business ventures while using PHFS resources, disadvantaged PHFS to secure future work for Stores 36 and 37, diverted resources from PHFS and Store Lenders—*while on PHFS's time*—for the benefit of their competing business, usurped a business opportunity that hindered the ability of PHFS and Store Lenders to continue their business, and used information acquired during their employment at PHFS to form a competing business.  The "factual context of the case is especially important because it involves the most common manifestation of the duty of

---

[10] Defendants warn that if the Court did not grant summary judgment, the decision "would create an unprecedented expansion of [the] duty as it would mean that an employee who owes duty of loyalty to his employer also owes the duty to companies related to his employer who do not employ him."  Doc. [160] at 20.  But such is not the case here. Defendants ignore the evidence painting a picture of their scheme to give their *personal business* ventures a competitive advantage by using *their employment* at PHFS to acquire information advantageous to their businesses, usurp business opportunities, appropriate a competitors business model—all while on their own employer's time.  The Court's ruling does not extend any duty; the duty remains the same: Reuter and Narup should not use their employment to the disadvantage of their own company and to the advantage of a competing business.

loyalty." *Scanwell*, 162 S.W.3d at 479.  The Court cannot find as a matter of law that Defendants did not breach a duty of loyalty.  *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 954 (8th Cir. 2007) (finding employees breached duty of loyalty under Missouri law by forming a competing company while still employed and using employer's trade secrets, confidential information, pricing and product information, and targeting customers); *Design Nine, Inc. v. Arch Rail Grp., LLC*, 4:18-cv-428-CDP, 2019 WL 1326677, at *7 (E.D. Mo. Mar. 25, 2019) (finding defendants breached duty of loyalty when they had access to unique and confidential information in their role as employees and took the data and information while still employed to use in competing business).

By working for Stores 36 and 37's interests while on PHFS's proverbial dime and depriving Store Lenders of the benefits of QFund10 by exploiting their position as PHFS employees, a reasonable jury could find Defendants acted "contrary" to PHFS's business interests, *Nat'l Rejectors*, 409 S.W.2d at 41, and to gain a business advantage, *Scanwell*, 162 S.W.3d at 479, especially considering Stores 36 and 37 own and operate competing loan stores directly with Store Lenders.  Summary judgment is denied as to Count IV.

B. **Trade Secrets**

In Counts II and III, Plaintiffs allege that Defendants misappropriated Plaintiffs' trade secrets in violation of DTSA and MUTSA.[11]  To demonstrate misappropriation of trade secrets, Plaintiffs must show, among other things, the existence of a protectable trade secret and misappropriation of that trade secret.  *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020).  Defendants dispute the first element: that Plaintiffs' materials are not protectable trade secrets as a matter of law.

---

[11] The parties agree that their arguments presented regarding the allegations under the DTSA and MUTSA are identical; therefore, the Court will treat the claims together. *See Design Nine, Inc. v. Arch Rail Grp., LLC*, 4:18-cv-428-CDP, 2019 WL 1326677, at *4 (E.D. Mo. Mar. 25, 2019) (analyzing MUTSA and DTSA claims together).

Under federal and Missouri law, a "trade secret" must derive economic value from not being generally known or readily ascertainable. 18 U.S.C. § 1839(3); Mo. Rev. Stat. § 417.453(4). During the pendency of this litigation, Plaintiffs designated a smorgasbord of different and specific categories as confidential/proprietary information and trade secrets as the materials Defendants misappropriated. Having examined the various affidavits, deposition transcripts, exhibits, and other evidence submitted, the Court finds that some or several of these materials provide economic value and are not readily ascertainable, both individually or as a combination.[12] *Cf. AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972–74 (8th Cir. 2011). The Court also finds there are questions of fact regarding whether some other materials constitute trade secrets, partly discussed in more detail below. Thus, the Court cannot rule that Defendants are entitled to judgment as a matter of law. As such, the Court denies summary judgment on Counts II and III.

The Court notes, however, that of the many materials that may gain trade secret protection, any material that is *plainly* given to the public (e.g.: customer referral vouchers) does *not* constitute trade secrets as a matter of law, even if viewed through the lens of Plaintiffs' business plan as a whole, rather than individually. *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Information that is public knowledge or that is generally known in an industry cannot be a trade secret."). With that said, at this stage in the litigation, the Court is not going to parse through the litany of materials and decide what materials can and cannot go to the jury under a trade secret

---

[12] The Court finds Plaintiffs' business plan, methods, and formula argument compelling. Doc. [157] 17–20. The Court notes the importance that Defendants' alleged misappropriation allowed them to compete with Plaintiffs on an immediate basis by using Plaintiffs' information and generating business at a much faster rate than Defendants would have without it. *See AvidAir*, 663 F.3d at 972 (explaining the value of a trade secret is "dependent" on "the effort of compiling useful information" based on the time, effort, and expense involved); *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 929 (E.D. Mo. 2010) (finding a question of fact regarding whether certain materials constitute trade secrets because plaintiffs provided evidence of time and expense of procuring the material). There is at least a question of fact as to whether Plaintiffs divulged the metaphorical "recipe" for Plaintiffs' business model, which in turn may be one of the types of trade secrets expressly provided for in the statute.

misappropriation theory.  Especially, when Defendants failed to request partial summary judgment on specific materials.  Fed. R. Civ. P. 56(a).  Instead, Defendants point, in what the Court perceives to be a legal sleight of hand, to *some* materials that may not be protected trade secrets and seek to equate such conclusion to mean that every single alleged misappropriated material is similarly not such that Defendants are entitled to summary judgment.  Defendants cannot pick two vegetables out of the cornucopia and say there is no more Thanksgiving dinner.

Based on the evidence before the Court, Plaintiffs are not acting frivolously or flippantly by designating a medley of materials as trade secrets because the undisputed evidence and facts show Defendants took a variety of different materials.  The facts in this case are complex.  The relationship between the parties is unique.   The nature of the alleged misappropriation is staggering.  Plaintiffs essentially argue that Defendants stole their *entire* business, ranging from their customers to their internal formula for approving loans.  The gravity of the amount taken and the nature of what was taken renders summary judgment inappropriate.  *AvidAir*, 663 F.3d at 973–74 ("Unlike patent law, which predicates protection on novelty and non-obviousness, trade secret laws are meant to govern commercial ethics."); *see also Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785 (8th Cir. 1996) (explaining the question of what constitutes a trade secret is fact-intensive).

With that said, the Court finds it necessary to address one of the alleged trade secrets— Plaintiffs' customized version of the QFund software.  Defendants argue that Plaintiffs' version of QFund is not a trade secret because it is not confidential or proprietary; but the Court finds this matter disputed as there is admissible evidence to the contrary.  *See, e.g.*, Doc. [156-8] ¶¶ 4–7.  Defendants also argue that Plaintiffs' customized version of QFund is not a trade secret because a different user could ultimately customize their programming and upgrades similarly to PHFS through "proper means."  18 U.S.C. § 1839 (stating that for proprietary information to qualify as

a trade secret, one must not be able to obtain the information by "proper means"); Mo. Rev. Stat. § 417.453 (same). While this may be true, Defendants *could have* expended their time and resources to create the same customizations as Plaintiffs—but they did not. Instead, there is evidence that Defendants took Plaintiffs' final QFund product, with Plaintiffs proprietary customizations that Plaintiffs designed and for which they paid.

In analyzing a similar situation, the United States Court of Appeals for the Eighth Circuit explained that even if information potentially *could have* been duplicated by other proper means, it is no defense to claim that one's product could have been developed independently of plaintiffs, if in fact it was developed by using plaintiff's proprietary designs. *See AvidAir*, 663 F.3d at 973–74. Instead, the court must look at whether the duplication of the information would require a substantial investment of time, effort, and energy. *Id.* Indeed, the value of the trade secret is not solely dependent on a "quantum of secret information;" rather, the critical inquiry is whether a plaintiff's effort, time, and expense of creating the proprietary product gives that business a competitive advantage. *Id.* at 972–73.

Here, there is evidence that Plaintiffs spent years of time, effort, and expense customizing QFund to function in a way that is tailored specifically to Plaintiffs' business. Defendants took these customizations and used them in their businesses. Notably, the record shows Defendants were only able to get Plaintiffs' version of QFund and QFund10 into their stores by representing themselves as Plaintiffs' employees, even though they were, in fact, working against Plaintiffs' interests for the benefit of Stores 36 and 37. *See, e.g.*, Doc. [156-8] ¶ 8. Nothing about that is "proper." Regardless, the element of secrecy is not negated simply because Defendants *could have* customized QFund from sources available to the public at great expense of both time and money. *See AvidAir*, 663 F.3d at 972–974. The fact is they did not. And based on the undisputed facts,

there is clearly some value to Plaintiffs' QFund customizations, upgrades, and programming. *Id.* at 972 ("The "existence of a trade secret is determined by the value of a secret, not the merit of its technical improvements.").

Finally, Defendants' *own* actions undercut their argument that the materials are readily ascertainable. Defendants "repeated attempts" to secure Plaintiffs' confidential and proprietary materials and software without PHFS's "approval belies its claim that the information in the documents was readily ascertainable or not independently valuable."[13] *AvidAir*, 663 F.3d at 974.

Next, Defendants argue that PHFS did not take reasonable steps to ensure the confidentiality of the alleged "trade secrets." Under both DTSA and MUTSA, to qualify as a trade secret, the owner must take "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3); Mo. Rev. Stat. § 417.453(4). Defendants contend that Plaintiffs did not do so and list certain events that may show Plaintiffs publicly disseminated whatever "trade secrets" it thought it had. There is, however, evidence demonstrating that Plaintiffs made attempts to ensure the confidentiality of any trade secrets it may have had. The first, and most obvious, piece of evidence is the Confidentiality Agreement, which Narup and Reuter were required to sign as PHFS employees. In addition, affidavits and deposition testimony indicate that PHFS took additional steps to keep its information confidential. Thus, the Court finds that the submitted materials indicate that there are material questions of fact as to whether Plaintiffs took reasonable steps to ensure the confidentiality of its alleged trade secrets. *Surgidev Corp. v. Eye Technology, Inc.*, 828 F.2d 452, 455 (8th Cir. 1987) ("The issue of whether a plaintiff took reasonable steps under the circumstances to maintain the secrecy of information is an issue of fact.").

---

[13] Regarding whether the information has independent economic value, the materials submitted indicate that there is, at least, a question of fact as to this element.

The Court also does not find compelling Defendants' argument that the information was not confidential because PHFS shared some of the alleged trade secrets and software with Store 36.  *See AvidAir*, 663 F.3d at 974 ("Misplaced trust in a third party who breaches a duty of confidentiality does not necessarily negate efforts to maintain secrecy."); *see also Kewanee Oil*, 416 U.S. at 475 ("This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another in confidence, and under an implied obligation not to use or disclose it." (internal quotation marks omitted)).  In support of this proposition, Defendants' point to the MSA between PHFS and Store 36/Reuter—by which Plaintiffs shared some of their confidential information—that did not contain a confidentiality provision.  Doc. [150-5].  While this point is factually correct, it does not prove, as a matter of law, that Plaintiffs did not sufficiently protect their confidential information.  *See Phyllis Schlafly Revocable Tr. v. Cori*, 512 F. Supp. 3d 916, 932 (E.D. Mo. 2021) (stating lack of confidentiality agreement for employees with access to trade secret does not show as a matter of law plaintiffs failed to take reasonable steps to keep the contents secret).

The Court, once again, notes the complexity of the parties' relationships and the facts surrounding the divulgence of information.  "The existence of a trade secret is not negated merely because an employee or other person has acquired the trade secret without express or specific notice that it is a trade secret if, under all the circumstances, the employee or other person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained."  *AvidAir*, 663 F.3d at 974 (quoting *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 900 (8th Cir. 2005)).  Here, a jury could reasonably believe that considering the close relationship between the parties, PHFS's decision not to take affirmative

steps to further ensure the secrecy of its information was reasonable under the circumstances.[14] As an example, it may have been reasonable for PHFS to enter the MSA with Reuter/Store 36 without asking him to sign a new, additional confidentiality agreement for Store 36. The parties had a long-standing familial (literally) relationship and significantly, Reuter, as a PHFS employee, *had already entered into a strict confidentiality agreement with PHFS* that required him to keep all of Plaintiffs' information confidential. Thus, there are questions of fact relating to whether Plaintiffs' allowance of Store 36 to use confidential documents and software destroys the existence of a trade secret as a matter of law. *See Surgidev*, 828 F.2d at 455 ("Only reasonable efforts, not all conceivable efforts, are required to protect the confidentiality of putative trade secrets.") (citing Uniform Trade Secrets Act ("UTSA") § 1(4)(i)-(ii), 14 U.L.A. 542 (1980)); *Wyeth*, 395 F.3d at 900; *AvidAir*, 663 F.3d at 972–75.

### C. Conversion

In Count IX, Plaintiffs assert a conversion claim against Defendants for conversion of Plaintiffs' personal property, including confidential information, trade secrets, and the QFund loan software. Doc. [97-1] ¶ 184. Under Missouri law, conversion occurs where there is an "unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Moore Equip. Co. v. Callen Const. Co.*, 299 S.W.3d 678, 681 (Mo. Ct. App. 2009) (quoting *Dwyer v. Unit Power, Inc.*, 965 S.W.2d 301, 305 (Mo. Ct. App. 1998)). As such, a claim for conversion has the following three elements: "(1) plaintiff was the owner of the property or entitled to its possession; (2) defendant took possession of the property with the intent to exercise some control over it; and (3) defendant thereby deprived plaintiff of the

---

[14] The Court agrees with Plaintiffs that the facts and circumstances in this case render Defendants' legal authority, *Farmers Edge Inc. v. Farmobile, LLC*, wholly inapplicable where there, the plaintiff shared its information with a random third-party contractor. 970 F.3d 1027, 1033 (8th Cir. 2020) (concluding such efforts were not reasonable).

right to possession." *JEP Enters., Inc. v. Wehrenberg, Inc.*, 42 S.W.3d 773, 776 (Mo. Ct. App. 2001).  Defendants argue they are entitled to summary judgment because Plaintiffs have not been deprived of possession of the allegedly converted property.

Here, PHFS was the authorized owner of QFund and the QFund10 software upgrade. Plaintiffs have shown Narup and Reuter, without authorization, diverted Plaintiffs' QFund10 upgrade from Store Lenders to Defendant Stores 36 and 37 and they did so under PHFS's contract with Virinchi.  This diversion allowed Defendants to have QFund10 up and running in their stores, while Plaintiffs did not.  Thus, the Court cannot find as a matter of law that Defendants did not deprive Plaintiffs of possession and control of QFund10.

The Court notes, however, with regard to any other conversion allegations (i.e.: Defendants improper use of any other materials), no conversion claim stands.  *Monarch Fire Prot. Dist. of St. Louis Cnty., Mo. v. Freedom Consulting & Auditing Servs., Inc.*, 644 F.3d 633, 637 (8th Cir. 2011) (holding no conversion under Missouri law where the plaintiff always had access to the relevant documents and defendant merely retained copies).  As the Court previously held in this matter, "Plaintiffs' claim for conversion survives only to the extent it alleges conversion of the QFund Software with modifications made at PHFS's expense." *Pinebrook Holdings, LLC v. Narup*, 4:19-cv-1562-RLW, 2020 WL 871578, at *7 (E.D. Mo. Feb. 21, 2020).[15]

D. **Tortious Interference**

In Counts VI and VII, Plaintiffs allege tortious interference with contract (Count VI) and business expectancy (Count VII).  Specifically, that Defendants tortiously interfered with Narup's and Reuter's Confidentiality Agreement with PHFS (Count VI) and that Defendants interfered

---

[15] The Court notes it also previously allowed the conversion claim to cover "any other documents or material taken and retained to which Plaintiffs no longer have access." *Pinebrook Holdings, LLC v. Narup*, 4:19-cv-1562-RLW, 2020 WL 871578, at *7 (E.D. Mo. Feb. 21, 2020).  However, the undisputed facts show Plaintiffs had access to all the materials, besides QFund10, such that Plaintiffs were never deprived of possession or control of any such materials.

with PHFS and Virinchi's business relationship by directing Virinchi to convert Store 36 (Defendants' store) to QFund10 instead of Pinebrook's Store 26 (Count VII).  To succeed on a claim for tortious interference with a contract or business expectancy under Missouri law, a plaintiff must show: "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct."  *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990).

First, Defendants argue Plaintiffs are unable to show the "knowledge" element as to Count VI.  Specifically, Defendants argue that no Defendant knew that any other Defendant signed a Confidentiality Agreement with PHFS.  For tortious interference purposes, "knowledge," is shown if "the interfering party had actual knowledge of the existence of the contract and of plaintiff's interest in it, or that the interfering party had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract and plaintiff's interest in it."  *Howard v. Youngman*, 81 S.W.3d 101, 113 (Mo. Ct. App. 2002).  All that is required is knowledge of the facts giving rise to a contract.  *Id.*  Knowledge of the precise terms of the contract is usually not necessary, and Defendants point to no Missouri case that requires such.  In fact, courts applying Missouri law have expressly rejected such strict interpretation.  *See, e.g.*, *RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, 5:18-cv-06037-DGK, 2021 WL 4258747, at *5 (W.D. Mo. Sept. 17, 2021) (rejecting argument that interfering party had no knowledge because he never saw a copy of agreement; rather the inquiry is whether the interfering party had knowledge of the facts that would lead a reasonable person to believe in the existence of the contract).

Here, there are sufficient facts for a jury to reasonably find Narup and Reuter had knowledge of each other's Confidentiality Agreement.  Although both Defendants attest that neither knew the other signed a Confidentiality Agreement in their employment with PHFS, exhibits documenting conversations between Narup and Reuter tell a different story.  Based on the conflicting evidence, the Court cannot find that Narup and Reuter did not have knowledge of the contract as a matter of law.  *See* Fed. R. Civ. P. 56.  Moreover, it is also undisputed that PHFS requires employees to sign a confidentiality agreement, Doc. [161] ¶ 4, and as employees of PHFS, both Narup and Reuter each had their own Confidentiality Agreement with PHFS.  Thus, the Court cannot find on this record that Narup and Reuter did not have knowledge of the facts that both were parties to a Confidentiality Agreement with their shared employer.

The Court, however, reaches a different conclusion as to Defendant Christine.  Unlike Narup or Reuter, Christine was not employed by PHFS nor exhibited any behavior showing she had knowledge the Defendants were subject to a Confidentiality Agreement.  Christine attested that she did *not* know Narup or Reuter had signed a Confidentiality Agreement.  Plaintiffs point to no evidence to contradict this assertion or show she had knowledge of facts that such agreement existed.  Thus, the Court will grant summary judgment in favor of Christine on Count VI.

Next, Defendants argue that no Plaintiff (other than PHFS) has standing to pursue Count VI because PHFS was the only Plaintiff-party to the Confidentiality Agreement.  Only parties to a contract and any third-party beneficiaries of a contract have standing to enforce that contract. *Verni v. Cleveland Chiropractic Coll.*, 212 S.W.3d 150, 153 (Mo. banc 2007).  A third-party beneficiary is one who is not privy to a contract or its consideration but is a party for whose "primary benefit" the other parties contracted.  *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 260 (Mo. banc 2002).  To be bound as a third-party beneficiary, the

terms of the contract must clearly express intent to benefit that party.  *Nitro Distributing, Inc. v. Dunn*, 194 S.W.3d 339, 345 (Mo. banc 2006).

As to Pinebrook, PHFS's parent company, the Court finds Plaintiffs' argument—that parent-status alone confers third-party standing—unavailing and contrary to well-settled legal principals.  *See Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375 (Mo. Ct. App. 2014) (explaining parent/subsidiaries are "regarded as wholly distinct legal entities, even if one partly or wholly owns the other"); *Mid–Missouri Tel. Co. v. Alma Tel. Co.*, 18 S.W.3d 578, 582–83 (Mo. Ct. App. 2000) (finding parent corporation could not ignore the legal distinction between itself and its wholly owned subsidiary, and thus could not acquire a contractual right that belonged to its subsidiary or assume a similar right by virtue of its ownership of the subsidiary).  Moreover, the Confidentiality Agreement expresses no intent whatsoever to benefit Pinebrook, and any benefit obtained from the Agreement, if at all, was incidental.  *Nitro*, 194 S.W.3d at 345 (explaining a  mere incidental benefit to the third-party insufficient to confer third-party beneficiary status).  The primary benefit argument is a much closer call as to Pinebrook Lenders, but in cases where, as here, "the contract lacks an express declaration of that intent, there is a strong presumption that the third party is not a beneficiary and that the parties contracted to benefit only themselves."  *Nitro*, 194 S.W.3d at 345.  Although the Confidentiality Agreement might incidentally provide a benefit to Pinebrook Lenders, it does not *clearly express* any intent that Narup or Reuter were undertaking a duty to benefit any other entity besides PHFS.  *Ward*, 75 S.W.3d at 260 ("Although it is not necessary that the third party beneficiary be named in the contract, the terms of the contract must express directly and clearly an intent to benefit an identifiable person or class."); *Verni*, 212 S.W.3d at 153 ("not every person who is benefited by a contract may bring suit to enforce that contract").  Accordingly,

Pinebrook and Pinebrook Lenders are not third-party beneficiaries, and only PHFS has standing to bring Count VI as the only plaintiff-party to the Confidentiality Agreement.

Finally, Defendants contend they did not use "improper means" when they interfered with Plaintiffs' business relationship with Virinchi and diverted the QFund10 upgrade from Store 26 (a Plaintiff store) to Store 36 (a Defendant store). "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Stehno*, 186 S.W.3d at 252. The Court finds that there are several facts in dispute relating to whether Defendants obtained QFund10 through "improper means." As an example, the parties dispute that Narup exploited the relationship he had developed with Virinchi during his employment at PHFS to facilitate the QFund10 upgrade to his own stores. *W. Blue Print*, 367 S.W.3d at 20 (finding improper means where the defendant used the relationship she had developed with a potential client during her employment with the plaintiff to usurp a business opportunity for her and her subsequent employer). Additionally, misrepresentations would constitute improper means, *Clinch v. Heartland Health*, 187 S.W.3d 10, 17 (Mo. Ct. App. 2006), but the parties are much in dispute concerning whether Narup misrepresented his authority as an employee of PHFS, thwarting Defendants' motion for summary judgment on this point.[16]

### E. **Computer Fraud**

In Count I, Plaintiffs allege Narup and Reuter improperly appropriated materials from Plaintiffs' computers in violation of the Computer Fraud & Abuse Act ("CFAA"). The Court

---

[16] Because the Court denied summary judgment as to several claims regarding Defendants' underlying conduct of alleged unlawful acts, the Court also denies summary judgment as to Plaintiffs' civil conspiracy claim (Count X). *Cf. Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. Ct. App. 2008) ("If the underlying wrongful act alleged as part of a civil conspiracy fails to state a cause of action, the civil conspiracy claim fails as well.").

concludes Defendants are entitled to summary judgment because the undisputed record shows no CFAA offense.[17]

CFAA can apply when an individual accesses a computer either *without* authorization or by *exceeding* his or her authorization. 18 U.S.C. § 1030(a)(2) (imposing criminal liability on anyone who "intentionally accesses a computer without authorization or exceeds authorized access" to obtain computer information). This distinction is critical. Very recently, the Supreme Court resolved a circuit split on the meaning of without-verses-exceeding authorization. *See Van Buren v. United States*, 141 S. Ct. 1648 (2021). Put simply, "without authorization" protects computers themselves from "outside hackers," while "exceeds authorized access" provides complementary protection for certain information within computers by targeting "so-called inside hackers." *Id.* at 1649.

Despite Plaintiffs' arguments to the contrary, Narup and Reuter are "so-called inside hackers," such that the *exceeding* authorization analysis applies.[18] Under CFAA, an individual

---

[17] While Defendants' sole argument on this Count is that Plaintiffs did not suffer a "loss" as defined in CFAA, 18 U.S.C. § 1030, the Court grants summary judgment on a different basis. Defendants specifically argue there is no compensable "loss" under CFAA because a majority of Plaintiffs' costs from investigating Narup and Reuter's alleged CFAA violation do not focus on technological harms. *See Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021) (explaining CFAA loss focuses on "technological harms," like impairment of the "integrity of availability" of computer data). The Court notes that post-*Van Buren*, courts are split on the interpretation of the phrase "cost of responding to an offense," as some courts limit these damages to "technological harms." *ACI Payments, Inc. v. Conservice, LLC*, 1:21-cv-84-RJS-CMR, 2022 WL 622214, at *12–13 (D. Utah Mar. 3, 2022) (explaining the differentiation among circuit courts' interpretation of "cost of responding to an offense" in light of *Van Buren*); *see, e.g.*, *Better Holdco, Inc. v. Beeline Loans, Inc.*, 20-cv-8686-JPC, 2021 WL 3173736, at *4 (S.D.N.Y. July 26, 2021) (limiting losses from responding to offense to situations involving damage to or impairment of computer). The Court does not opine on this issue because regardless of which interpretation the Court adopts, here, there is no CFAA offense, as further explained in this Memorandum and Order. The Court notes that even if it viewed this issue in the "loss" context, the same conclusion is reached. Of the total expenses claimed, about half ($4,587.50) were paid to Stinson LLP. But, for the same reasons as finding no CFAA offense, the costs paid to Stinson to investigate Narup and Reuter's alleged misuse of otherwise available information is not a compensable "loss" under CFAA. And, absent the fees paid to Stinson, the total claim drops below the $5,000 required under CFAA to state a cause of action. *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I) (requiring CFAA plaintiff to suffer a loss of more than $5,000 in economic damages resulting from the alleged violation).

[18] Plaintiff provides no evidence that Narup and Reuter accessed the data without authorization. Rather, Plaintiffs argue Narup and Reuter "lost their authorization" upon a breach of loyalty. *See International Airport Centers, L.L.C.*

"exceeds authorized access" when he accesses a computer with authorization but then obtains or alters information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him. *Van Buren*, 141 S. Ct. at 1652. An individual, however, who has "improper motives" for obtaining information that is otherwise available to him does not commit an offense under CFAA.[19] *Id.* at 1660. Motive and intent of the individual are not controlling; the question is whether the individual had the ability to access the information.

Plaintiffs do not argue or provide any evidence that Narup and Reuter accessed areas of the computer that were off-limits to them. Nor it is reasonable to infer Reuter and Narup accessed data they were not authorized too. Rather, this entire case concerns Narup's and Reuter's alleged misappropriation of proprietary and company information to which they were privy as employees of PHFS.[20] This point is further illustrated by looking at the specific CFAA claim here, concerning whether and what information Narup and Reuter obtained for *improper purposes*.[21] *See* Doc. [156] ¶ 47 ("As part of Plaintiffs' investigation into Narup's and Reuter's actions, they hired an outside law firm to investigate the extent to which Narup and Reuter accessed Plaintiffs' computers for improper purposes."); Doc. [155] ¶ 61 ("accessed computers for purposes other than their employment"); Doc. [150-23] ("suspected illegal misuse of PH Financial company computers and

---

*v. Citrin*, 440 F.3d 418 (7th Cir. 2006). The Court does not find Plaintiffs' argument that *Citrin* was not abrogated by *Van Buren* persuasive. Doc. [157] at 48 n.35.

[19] The facts in *Van Buren* illustrate this point. There, a police officer with access to the law enforcement database ran a license-plate search in exchange for money. *Van Buren*, 141 S. Ct. at 1652. Although the officer used the information for improper purposes, the Supreme Court held that he did not violate CFAA because he did not "exceed authorized access" under the CFAA. *Id.*

[20] Most courts do not find that misappropriation of confidential, trade-secret information damaging plaintiff's business interests are a sufficient "loss" under the CFAA. *Pipeline Prods., Inc. v. S&A Pizza, Inc.*, 4:20-cv-130-RK, 2021 WL 4811206, at *6 (W.D. Mo. Oct. 14, 2021) (collecting cases).

[21] Nor did Plaintiffs provide evidence of any technological harms, like deleted emails and data. *See Pinebrook Holdings, LLC v. Narup*, 4:19-cv-1562-RLW, 2020 WL 871578, at *5 (E.D. Mo. Feb. 21, 2020) (previously denying Defendants' motion to dismiss where Plaintiffs alleged spending over $5,000 to investigate what emails and electronic data, if any, Narup and Reuter deleted).

confidential, proprietary, and trade secret information"); Doc. [150-24] at 6–7 (9:4–18) (hiring investigators based on "concerns" that Reuter and Narup had accessed, downloaded, or copied information from computers that "went beyond their duties" and for "their own purposes"); Doc. [97-1] ¶ 132 ("Defendants Narup and S. Reuter fraudulently or intentionally exceeded their authorization to access PHFS's protected computers and protected computer network.").  Under the facts here, Narup and Reuter's alleged misuse of otherwise available information is not a violation of CFAA.  *Van Buren*, 141 S. Ct. at 1652 (holding CFAA is not violated by those who have improper motives for obtaining information that is otherwise available to them).  As the Supreme Court explained, CFAA is "ill fitted" to "remediating 'misuse' of sensitive information that employees may permissibly access using their computers."  *Id.* at 1660.  That is exactly the situation before the Court.  The Court grants summary judgment as to Count I.

### F.  **Lost Profits**

Defendants argue summary judgment should be granted on Counts II–VIII[22] for Plaintiffs' failure to prove the essential element of damages based on Plaintiffs' inability to prove lost profits.[23]

A plaintiff may recover for lost profits that he or she establishes with reasonable—not absolute—certainty.  *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 195 (Mo. Ct. App. 2007).  The "modern emphasis" on the requirement that damages be shown with certainty is on the "fact of damage" and not on the particularized amount.  *Penzel Constr. Co., Inc. v. Jackson R-2 Sch. Dist.*, 544 S.W.3d 214, 236 (Mo. Ct. App. 2017); *Cent. Telecommunications, Inc. v. TCI*

---

[22] The Court notes Defendants one-size-fits all approach is unavailing because a plaintiff's burden to prove lost profits varies with the nature of the claimed loss.

[23] The Court notes that Plaintiffs did *not* pray for lost profits *only*, as Defendants so suggest.  *See, e.g.*, Doc. [97-1] at 34 ("monetary damages . . . "including lost profits"); *see also* Doc. [150-15] at 4; *see also, e.g.*, 18 U.S.C. § 1836(b)(i) (allowing "damages for actual loss" and "damages for any unjust enrichment").

*Cablevision, Inc.*, 800 F.2d 711, 730 (8th Cir. 1986) (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565–67 (1981)).  In other words, "certainty" means that damages have been suffered—not exact proof of the amount of the damages.  *Harvey v. Timber Res., Inc.*, 37 S.W.3d 814, 819 (Mo. Ct. App. 2001); *see also Refrigeration Industries, Inc. v. Nemmers*, 880 S.W.2d 912, 920 (Mo. Ct. App. 1994) ("While anticipated profits of a commercial business have historically been regarded as too remote and speculative to warrant recovery, they are recoverable if the plaintiff can prove with reasonable certainty that (1) the defendant's conduct caused some loss of profit; and (2) the extent of the loss.").  Once the fact of damages has been established, courts "require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury."  *BMK Corp.*, 226 S.W.3d at 196.

The Court does not wish to belabor the facts, so it concludes that based on the facts discussed throughout this Memorandum and Order, Plaintiffs have put forth evidence from which a reasonable jury could find the existence of lost profits.  The Court also finds that Plaintiffs have provided a sufficient basis from which a damages calculation can be determined with a degree of reasonable certainty.

One such basis is evidence representing the profits that Plaintiffs could have earned but for Defendants' actions, from which a jury could make a reasonably certain calculation as to the number of damages.[24]  Narup began working to upgrade Store 36 (a Defendant store)—instead of Store 26 (a Pinebrook store)—to QFund10 in April 2018.  Plaintiffs did not discover this fact until

---

[24] The Court also notes Defendants' objections to Stoltz's computation of damages; but even if the Court were to exclude the computation, that, by itself, would not warrant summary judgment for reasons the Court discussed in this Memorandum and Order.  Further, at this stage in the litigation, the Court is not convinced that Stoltz is precluded from providing opinion.  In their initial brief, Defendants offer a passing line with a string of citations to the Federal Rules of Evidence regarding why Stoltz's testimony regarding damages would be inadmissible.  Doc. [149] at 12.  In their Reply Brief, Defendants devote a little more space to this issue, but still, it is sparse and conclusory.  Doc. [160] at 9–10.  The briefing does not offer the Court enough for it to conclude—at this stage—that Plaintiffs cannot produce admissible evidence through Stoltz to support facts establishing Plaintiffs' damages.  *See* Fed. R. Civ. P. 56(c)(1)(B).

October 2018, and at that point, there is evidence that no work had been done to upgrade Store 26 or the other Store Lenders.  Based on this delay, Store Lenders allegedly lost revenue from servicing loans online, as opposed to solely in-person.

Defendants put forth a multitude of factors purporting to show why Plaintiffs' claimed additional revenue from this loss is exaggerated.  Although there could have been other reasons for delay in 2018 and beyond, as Defendants suggest, Defendants' interference unequivocally caused, at minimum, *some* delay.  It is for the jury to determine whether Plaintiffs' arguments regarding causation and the quantity of their losses are sufficient for an award of actual damages. *Vandervort v. Nationstar Mortg., LLC*, 2:14-cv-04014-SRB, 2015 WL 12731917, at *9 (W.D. Mo. Feb. 11, 2015).  Thus, the Court finds that the amount of damages flowing from Plaintiffs' inability to write online loans is strictly an issue for the jury to decide.

As to the other categories of lost profits, the Court agrees with Plaintiffs that the damages allegedly suffered are "of a character which defies exact proof."  *See Ameristar*, 155 S.W.3d at 54–55.  Contrary to Defendants assertions, "lost profits determinations do not operate as an exact science." *Am. Eagle Waste Indus., LLC v. St. Louis Cnty., Mo.*, 463 S.W.3d 11, 19 (Mo. Ct. App. 2015).  This principle is especially applicable where, as here, a party demonstrates a "substantial pecuniary loss." *Ameristar*, 155 S.W.3d at 54–55.  Accordingly, the Court is more inclined to "afford greater discretion" to a jury in determining Plaintiffs' damages.  *See id.*

In conclusion, the Court finds that here, "the fact of damage [is] clear, but the amount of the loss [is] in dispute.  [As such,] [t]he amount of damages is a matter for the jury to decide." *Harvey*, 37 S.W.3d at 820.  Because Plaintiffs have provided sufficient evidence to show a loss of profits was suffered and that a jury can and should determine the amount of such loss, the Court will deny Defendants' Motion for Summary Judgment as to Counts II–VIII as to this issue.

G. **Unjust Enrichment**

In Count VIII, Plaintiffs allege unjust enrichment based on Defendants unauthorized use and disclosure of PHFS's materials, software, business plan, and other confidential information. Defendants argue they are entitled to summary judgment because Plaintiffs never mention a specific amount of benefits, how much of the benefits are unjust, or even how one would go about determining the specific amount of benefits that would be unjust. Defendants misstate the law, the burden, and the quantum of evidence necessary at this stage of the litigation. For these reasons, discussed in detail below, the Court denies summary judgment.

Contrary to Defendants' argument, Plaintiffs do list several specific benefits that Defendants received. To name just a few, Plaintiffs point to evidence that Defendants were enriched by the wrongful and unauthorized use of Plaintiffs' proprietary materials to the advantage of their competing business, the appropriation of Plaintiffs' customized QFund rather than creating their own software, and the usurpation of the QFund10 upgrade, all while Narup and Reuter were *on PHFS's payroll*. Plaintiffs have presented sufficient evidence of the "essence" of an unjust enrichment claim. *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 536 (Mo. Ct. App. 2011) ("The essence of unjust enrichment is that the defendant has received a benefit that it would be inequitable for him to retain."). Notably, Defendants do not argue that they did not realize a profit (i.e.: enrichment or a benefit). Perhaps, the Court's ruling would be different if, for example, Defendants took Plaintiffs' business materials and implemented it into a business that subsequently failed. *See, e.g.*, *Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 931 (E.D. Mo. 2010) (finding unjust enrichment is an inappropriate remedy where the defendant took trade secrets for a business that will never become operational). But that is not what happened here. In fact, the record shows Defendants' businesses are profitable, arguably from their unfair head-start in

creating a competing business from Plaintiffs' proprietary materials. *Hallmark*, 758 F.3d at 1059 (calculating unjust enrichment damages under Missouri law based on the actual amount of money defendant saved by using plaintiff's proprietary information instead of commissioning its own).

Clearly, the record contains evidence from which a jury could find that Defendants obtained a benefit—all or some of which may have been unjust for them to retain. *Pitman v. City of Columbia*, 309 S.W.3d 395, 403 (Mo. Ct. App. 2010) (stating the measure of recovery in an unjust enrichment action is not the actual amount of the enrichment, but the amount of the enrichment that would be unjust for one party to retain); *White v. Pruiett*, 39 S.W.3d 857, 863 (Mo. Ct. App. 2001) (explaining a plaintiff must prove the benefit "would be unjust for one party to retain"). Although Plaintiffs do not present specific numbers to quantify the amount of damages under these theories, the record evidence establishes, at a minimum, that Defendants enriched themselves such that triable issues of fact remain as to the amount of the enrichment that would be unjust for them to retain. *See, e.g.*, *Hallmark*, 758 F.3d at 1059 (explaining unjust enrichment damages depend on the defendants use of the trade secrets). As such, Defendants have not shown that Plaintiff "cannot produce admissible evidence to support" the amount of the benefit conferred on Defendants that would be unjust for them to retain. *See* Fed. R. Civ. P. 56(c)(1)(B). Because Defendants have not met their burden under Rule 56(c), the Court denies Defendants' Motion for Summary Judgment on Count VIII.

## CONCLUSION

The Court grants summary judgment in favor of Defendants on Count I because there is no CFAA offense. The Court grants partial summary judgment on Count VI in favor of Defendant Christine Reuter because the undisputed facts show she did not have knowledge of the Confidentiality Agreement. The Court also holds that summary judgment on Count VI is proper

as to all Plaintiffs—except PHFS—because Pinebrook and Pinebrook Lenders do not have third-party standing to assert a claim for tortious interference with contract.  The Court denies summary judgment on all other Counts.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, Doc. [148], is **DENIED in part** and **GRANTED in part**.

Dated this 1st day of June, 2022.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE