IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PINEBROOK HOLDINGS, LLC, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) Case No. 19-cv-1562 |
| AARON NARUP, *et al.*, | ) ) |
| Defendants. | ) ) |

**DEFENDANTS' SECOND MOTION
FOR JUDGMENT AS A MATTER OF LAW**

Rule 50 of the Federal Rules of Civil Procedure states:

(a) Judgment as a Matter of Law.

> (1) *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
>
> (2) *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

All defendants are entitled to judgment as a matter of law against all plaintiffs on all counts. Defendants request that the court enter such a judgment instead of submitting the case to the jury.

1

I.   **Misappropriate of trade secrets.**

Plaintiffs allege two trade secrets: (1) the QFund customizations and (2) their Business Plan and Model. Because the QFund customizatitons are claimed to be part of the Business Plan and Model, a showing that the QFund customizations cannot be a trade secret will defeat the Business Plan and Model as well.

A.   **QFund customization claim.**

The agreed verdict-directing instruction on misappropriation of trade secrets properly states the law. The generic version of that instruction with respect to the QFund customizations states:

> Your verdict must be for Plaintiff against Defendant on plaintiff's claim for misappropriation of a trade secret if you believe:
>
> First, plaintiff owns its customized version of QFund loan management software, and
>
> Second, its customized version of QFund is a trade secret as described in Instruction No. ___, and
>
> Third, plaintiff took reasonable measures to protect the secrecy of its customized version of QFund, and
>
> Fourth, Defendant misappropriated the customized version of QFund as described in Instruction No. ___, and
>
> Fifth, plaintiff was thereby damaged.

Every plaintiff fails to make a submissible case for misappropriation of the QFund customizations under paragraphs First (ownership), Fourth (misappropriation), and Fifth (damages) of the above instruction.

## 1. Ownership of QFund customizations.

Plaintiffs claim that each of them owns the QFund customizations. This claim fails. Plaintiffs' Exhibit 103, the licensing agreement between PH Financial Services, LLC ("PHFS") and Virinchi Technologies Limited, for the QFund applications, provides that the QFund applications belong to Virinchi.

> b. **The Customer acknowledges that Intellectual Property Rights for the QFund Applications reside with the Company** and hence only the Company will perform any changes to the Base QFund applications for any integrations or interfacing or customization to accommodate such integration, interfacing or otherwise with any third party applications. …
>
> **As between Company and Customer, Company shall retain all intellectual property rights, legal title, copyright and other propriety rights of the Base QFund Applications and associated documentation**. It is further agreed that:
>
> a. As between Company and Customer, **Customer shall retain all legal title, copyright and other proprietary rights to any data or other information provided to Company**, entered into the Base QFund Applications by any of Customer's users or created by such applications as a result of such input.

*Exhibit 103* at 6 (emphasis added).

The Copyright Catalog maintained by the United States Copyright Office lists Virinchi as the author and owner of the QFund software, as employer for hire, under Copyright Registration No. TX000658638.[1]

---

[1] Catalog entry available online at: https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&Search%5FArg=QFund&Search%5FCode=TALL&CNT=10&PID=Lsx3fowA6AsXFLZkfakYqoEcjW1v&SEQ=20230124212028&SID=2

Plaintiffs argue that, notwithstanding the express contractual language, the customizations portions of the QFund applications are plaintiffs' property because PHFS gave Virinchi the information it used in preparing the customizations and because PHFS paid Virinchi to write the software code to its specifications. These claims are based on an obvious misreading of *subparagraph a* of the contract. The claims also fail as a matter of law.

The Copyright Act, Title 17 of the U.S. Code, controls. Computer code, such as QFund and its customizations, is subject to the Copyright Act to the extent that it is expressive and not purely functional. *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1197 (2021). "The Copyright Office classifies computer programs as nondramatic literary works because they can be expressed in words and numbers." *Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1013 (8th Cir. 2006).

Here, the testimony demonstrates that the QFund customizations are primarily, and perhaps exclusively, expressive in nature, as they concerned the formats of reports of the data stored in the system, forms to be filled out and printed, checks to be filled out and printed, and so on. Consequently, ownership of the QFund customizations, to the extent that one feels a need to look beyond the licensing agreement, is determined by copyright law, which also places ownership solely in Virinchi.

Section 201 of the Copyright Act, Title 17, establishes who owns the copyright in a work. It states in relevant part::

> (a) **Initial Ownership.**—Copyright in a work protected under this title vests initially in the author or authors of the

work. The authors of a joint work are coowners of copyright in the work.

(b) **Works Made for Hire**.— In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright. …

(d) **Transfer of Ownership.**— (1)The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

Here, the identity of the authors of the QFund program is not in evidence, but we know that it is not PHFS or any of its employees. Thus, no plaintiff is an author and owner under paragraph (a). No instrument or other means of conveyance of the ownership of the software is in evidence. Thus, no plaintiff can claim ownership under paragraph (c). This leaves, then, only the possibility of ownership through the work for hire doctrine, paragraph (b). Copyright law is clear, however, that the QFund customizations are not a work for hire as to PHFS or any plaintiff.

Section 101 of the Copyright Act defines "work for hire":

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, **if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire**. …

5

17 U.S.C § 101 (emphasis added).

Subsection 1 does not apply; there was no employer-employee relationship between PHFS or any plaintiff and any of the programmers who wrote the customizations. So that leaves subsection 2. The customization can be considered contributions to a collective work. There is, however, no written agreement in evidence between PHFS (or any plaintiff) and any of the programmers (or their employer Virinchi) that the customizations would be considered a work made for hire by PHFS or any plaintiff.

(Indeed, to the contrary, the parties' written agreement clearly provides the opposite, that Virinchi owns the QFund software and all intellectual property associated with it.)

Consequently, under the Copyright Act, the absence of a written agreement making the QFund customizations a work for hire by PHFS makes it clear as a matter of law that neither PHFS nor any other plaintiff owns the QFund customizations.

    **2.    Judicial admissions of non-ownership of the QFund customizations.**

There is a second reason why the ownership element of the trade secret claims fails for most of the plaintiffs. Brian Stoltz, the representative of all of the plaintiffs, admitted in his direct testimony at trial that none of the loan store operators owned the QFund customizations, testifying first that PHFS was the sole owner and later that Pinebrook Holdings was the sole owner of the customizations.

The argument relating to these judicial admissions was set out at length in defendants' motion for judgment as a matter of law during Stoltz's testimony. That motion is adopted and incorporated herein as though restated in full.

The only alternation to the earlier Rule 50 motion is that defendants now have a transcript of the relevant trial testimony. That transcript, which is in two volumes, is attached as an exhibit to this motion. Stoltz's testimony was as follows.

On Wednesday, January 18, Stoltz testified:

> Q   (By Ms. Pesce) Does — as you — as the Chief Operating Officer for PH Financial Services, is it the sole owner of the business plan and model and its components that we have talked about extensively today?
>
> A   Yes, it is.

On Thursday, January 19, Stoltz testified (emphasis added):

> Q   (By Ms. Pesce) Thank you. Let's see. Going back to the business plan and model that we've talked quite a bit about and the components of the business plan and model, who owns the business plan and model?
>
> MR. VIANELLO: Objection. Asked and answered.
>
> THE COURT: Overruled.
>
> A   **Pinebrook Holdings owns the business plan and model.**
>
> Q   (By Ms. Pesce) And — and are there other entities that are involved with Pinebrook Holdings, the individual LLCs, that provided the expenses and the creation and the design that are also owners of that business plan and model?

7

> A   All of the — yeah, all of the — the entities that Pinebrook owns.
>
> Q   So all of the individuals within the Pinebrook family?
>
> A   Yes.
>
> Q   And so if you say Pinebrook or PH owns the business plan and model, are there any third parties that are owners or part owners of that business plan and model?
>
> A   No, ma'am.
>
> **Q   All right. The same with regard to the QFund customizations. Is it the Pinebrook — who owns the QFund customizations?**
>
> **A   It belongs to Pinebrook.**
>
> **Q   And when you say "Pinebrook," what do you mean by that?**
>
> **A   Pinebrook Holdings, LLC.**

Plaintiffs do not own the QFund customizations because they are owned by Virinchi. Moreover, the loan company plaintiffs, speaking through their corporate representative, Brian Stoltz, judicially admit that they do not own the QFund customizations.

### 3.   Ownership of the Business Plan and Model.

The agreed instruction defining the Business Plan and Model states that it consists of **all** of the specified elements, including the QFund customizations. Indeed, Stoltz said on several occasions that the QFund customizations were the most important part of the Business Plan and Model and was the life blood of their business. Since

no plaintiff owns the QFund customizations, no plaintiff owns the Business Plan and Model, of which the QFund customizations form an integral part. In addition, per Stoltz's testimony quoted above, plaintiffs have judicially admitted that the loan store plaintiffs, that is, all of the plaintiffs other than PHFS and Holdings, have no ownership of the Business Plan and Model.

Finally, there were multiple components of the supposed Business Plan and Model for which no evidence was offered at trial. Since plaintiffs did not offer evidence of the existence of those elements, they cannot show that these elements exist and are owned by plaintiffs. There was an absence of evidence as to: vendor lists; standards for loan approvals; marketing plans; and design graphics. Although these elements were frequently alluded to during the trial, at no time did plaintiffs ever offer any of these documents in evidence. Nor did plaintiffs offer any evidence of the defendants' vendor lists, standards for loan approvals, marketing plans, or design graphics, making it impossible for any reasonable jury to compare the two and conclude that defendants were using those developed by PHFS.

Thus paragraph First fails with respect to the Business Plan and Model trade secret claims as well.

**B.    No evidence of misappropriation.**

The evidence is undisputed that upon its departure from its Management Services Agreement with PHFS, ACS licensed QFund 10 from Virinchi, the software's author and owner, ACS had a right to license the software from its owner. It is not a misappropriation to license software from the person who owns the software.

> There can be no misappropriation where acquisition, disclosure, and use of a trade secret have been expressly authorized by contract. A valid contractual acquisition can hardly be characterized as "improper means," which the VUTSA defines as "theft, bribery, misrepresentation, use of a computer or computer network without authority, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Code § 59.1-336. A comment to the Uniform Trade Secrets Act specifically lists acquisition "under a license from the owner of the trade secret" as an example of "proper means," Uniform Trade Secrets Act § 1 cmt. (Nat'l Conf. of Comm'rs on Unif. State Laws 1985), assuming that the contractual relationship is not procured through fraud.

*Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 260 (2016) (interpreting uniform trade secret act, the same uniform act adopted by Missouri).

On this basis alone, that Store 36 and Store 37 used QFund 10 with the permission of its owner, Virinchi, the element Fourth (misappropriation) fails for every trade secret claim relating to the QFund software.

There is an additional basis for finding no misappropriation with respect to the QFund customizations, and that is that the evidence is clear that ACS did not take the customized version of the base QFund application with it when it left its Management Services Agreement with PHFS. Instead, ACS "took" with it QFund 10, a different software application that operated differently, looked different, and did not include the old QFund's customizations. Put another way, plaintiffs offered no evidence at trial that the QFund 10 that Stores 36 and 37 used included the customizations that plaintiffs claim as their trade secret.

And while plaintiffs offered no evidence of substantial similarity between the two software applications, defendants' evidence — which was the only evidence on the issue — was that there was only about a 10% overlap between the two programs. There is also no dispute that although the old QFund as customized worked perfectly well for the stores that PHFS managed, QFund 10 did not and that, in fact, its performance was so deficient that defendants abandoned the software and plaintiffs moved to a different loan management software, Infinity, after converting the three stores operated in New Mexico and Wisconsin to QFund 10.

Since the software that Stores 36 and 37 used was not substantially similar to what was claimed to be taken, plaintiffs have not established that the QFund customizations were taken and the claims must fail.

The claims also fail with respect to the Business Plan and Model claims other than the QFund customizations. Plaintiffs' case at trial focused mainly on PHFS's vendors, many of whom ACS and ACSM 2 used in their own business after Narup and Reuter left PHFS's employment.

Plaintiffs' counsel emphasized, and defendants Reuter and Narup agreed, that they only knew about those vendors because of their work for PHFS. Plaintiffs err, however, in think that this somehow shows the taking of a trade secret. The agreed instruction on the definition of a trade secret accurately states the law on this issue: "An employee's personal skills, talents or abilities are not trade secrets and facts and information acquired by an employee during employment can only be trade secrets if they otherwise meet the definition of a trade secret."

11

In addition, the evidence was clear that Reuter, through his company SJR, purchased Store 36 and everything in it, which included all of the documents in the loan files, which included all of the loan forms, disclosure forms, signage forms, etc. In fact, the unrefuted testimony was that the only PHFS-supplied document that had a material change made from the date Reuter bought Store 36 to the date he left the "Pinebrook umbrella" was the customer discount voucher.

Plaintiffs claim the voucher form and the numerous other documents provided to customers and potential customers and placed throughout their stores and even the signing on the exterior of the stores as "confidential" notwithstanding their broad publication under a novel theory of released confidential information:

> Q   And let's talk about the customer referral vouchers for a minute. Are those things that are actually provided to customers?
>
> A   Yes.
>
> Q   And so if you're providing them to customers, are they considered to be confidential information by the company?
>
> A   Well, confidential information that we're releasing out into the world. I mean they are — they're certainly vouchers that we've designed that we store on our servers. We password-protect those. I wouldn't share those with our competitors and say, "Hey, this is how we use them and how we fluctuate the use of them throughout the course of the year" and different amounts that we might, you know, put on those vouchers. So it's — I mean it is confidential, yes, I mean, and yet we want our customers to — to use those. I mean they're — they're referring us more business.

12

## C. No damages.

Plaintiffs fail to put on any evidence of any damages resulting from the alleged trade secret misappropriations. They fail to do so in several ways.

First, plaintiffs Pinebrook Holdings ("Holdings") and PHFS cannot claim damages from trade secret misappropriations. While Holdings contends that it was damaged because all of the loan store profits eventually flow up to Holdings in the form of member distributions, this claim violates basic legal doctrines and would require the court to ignore the separate legal existence of the loan store entities and their owner, Holdings. "As a general rule, a limited liability company … is considered a separate legal entity that is distinct from its members." *State ex rel. Family Support Division v. Steak'm Take'm LLC*, 524 S.W.3d 584, 592 (Mo. App. 2017).

Holdings's claims *as the owner* of the loan store entities is a derivative claim, not a claim individual to Holdings, and is therefore one which it lacks legal standing to bring. *Nickell v. Shanahan*, 439 S.W.3d 223, 229 (Mo. 2014) (injury to corporation owned by plaintiff is not the plaintiff's individual claim). "A shareholder is without standing to sue in his individual capacity for damages to the corporation. This is the case even if all of the shareholders join in the suit and the corporation does not have any creditors." *Cook v. Cook*, 143 S.W.3d 709, 711-12 (Mo. App. 2004).

Plaintiffs' entire "umbrella" or "family" theory disrespects the corporate structure that plaintiffs chose and, if accepted, would allow plaintiffs to turn their separate corporate identities on and off at will. "As a general rule, a plaintiff may only assert his own injury in fact and cannot rest his claim to relief on the legal rights or interests of

13

third parties." *Hodak v. City of St. Peters*, 535 F.3d 899, 903-904 (8th Cir. 2008). While plaintiffs claim they share a unity of interest, "two separate corporations are regarded as wholly distinct legal entities, even if one partly or wholly owns the other." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375 (Mo. App. 2014).

PHFS similarly has no damages. It owns no loan stores and thus cannot and does not claim that it lost the opportunity to make more loans at a profit. It's income is based on monthly fees paid by the loan stores; it does not allege that those fees were reduced as a direct result of the alleged misappropriation of trade secrets.

### D. No damage causation.

The damages claimed by the lender plaintiffs, that is, the lost profits they claim from lost loans from their alleged delay in implementing QFund 10, are logically disconnected from the supposed misconduct, misappropriating trade secrets. Even if there were trade secrets that were misappropriated — and there were not — defendants' possession of such trade secrets could not have deprived the lender plaintiffs of their ability access to QFund 10. The alleged loss profits all flow from the delay in implementing QFund 10, which Brian Stoltz testified was delayed because of his extended, nearly year-long investigation into what had happened and the absence of Aaron Narup from PHFS employment, on the theory that Narup could have implemented the QFund 10 upgrade when Virinchi could not.[2]

---

[2] Defendants do not agree that Stoltz's testimony about his supposed investigation was truthful or accurate or that Narup has magical powers of software implementation. Nevertheless, the testimony is accepted as true for purposes of this motion.

14

Here the alleged misappropriation of trade secrets *did not take anything away from plaintiffs*. Plaintiffs still had their QFund customizations and the rest of their Business Model and Plan to use, even if a defendant had it, too. Thus there is no causal connection between the alleged misappropriation and the alleged damages.

## II. Civil conspiracy.

The stipulated verdict directors for the civil conspiracy claims require each plaintiff to prove the following element, among others, to establish their claim:

> "First, Defendant [name] agreed with Defendants _____ (write the name or names of the defendant or defendants with whom Defendant agreed or write 'none') to facilitate or encourage either Defendant Stephen Reuter or Defendant Aaron Narup to misappropriate **Plaintiff's trade secrets** …" (emphasis added).

The civil conspiracy claim thus fails for two reasons. First, the instruction requires the plaintiff asserting the claim to own the trade secrets. This, as shown above, plaintiffs have failed to do.

Second, plaintiffs must show that there was an agreement between at least two defendants to encourage either Reuter or Narup to misappropriate a trade secret. Again, plaintiffs offered no evidence of an agreement to misappropriate a trade secret. Thus, the civil conspiracy claims fail.

## III. Breach of contract.

Both breach of contract claims fail because plaintiffs failed to offer any evidence of damages resulting for any alleged breach of either contract. While Narup acknowledges that he copied PHFS documents onto an external hard drive and emailed

15

documents relating to online lending to himself, plaintiffs put on no evidence that any of this confidential information was ever used by a defendant. Moreover, with respect to the hard drive, the expert witness established that the documents were never accessed and were never downloaded to Narup's ACS computer, the only computer to which the hard drive was attached after the documents were copied to it.

In addition, with respect to Reuter, the evidence was that the documents that he used were documents he owned, having acquired them through his purchase of ACS and all of its loan files and the materials on the premises of Store 36.

**IV.    Tortious interference with contract.**

There was no evidence that either Narup or Reuter knew about the other one's contract, and both gentlemen testified that they did not, in fact, know that the other one was bound by such a contract.

There was also no evidence that either caused the other to breach his contract.

**V.    Duty of loyalty.**

There was no evidence that either defendant's actions went beyond mere planning and preparations. There was no evidence that either Store 36 or Store 37 were in direct competition with any of the plaintiffs' stores. Both were located well outside the 3 to 5 mile bubble that Brian Stoltz testified to as being the market area of a short-term loan store. Defendants agreed that proximity would lead to direct competition, and thus they established Store 37 some 20 to 25 miles away from the closest loan store owned by any of the plaintiffs so as to avoid any direct competition.

With respect to RN Financial, the evidence is undisputed that it did not go into business until some two years after both Narup and Reuter had left the employ of PHFS, thus that business could not be a violation of their duty of loyalty.

With respect to damages, it appears that plaintiffs are seeking either the same damages as sought under the misappropriation of trade secrets claims, which fail for the same reason, or for a return of eight months salary by both Narup and Reuter. Obviously, PHFS was not entitled to receive the eight months of late nights and long weekends of work for free. It was its obligation to specify how much of the time spent by Narup and Reuter was not spent on behalf of their employer and request a recoupment of just that amount. That was its burden, which it failed to meet, and thus damages fail for this claim, too.

## VI.  Unjust enrichment.

This appears to be just a rehashing of all of the other claims. It fails for all the reasons mentioned previously.

## CONCLUSION

The court should grant all defendants judgment as a matter of law on all claims made by all plaintiffs.

Jacobson Press P.C.

By: /s/ Joe D. Jacobson
Joe D. Jacobson #33715 MO
Matthew B. Vianello #63303 MO
222 South Central Ave., Suite 550
Clayton, Missouri 63105
Tel: (314) 899-9789
Direct: (314) 899-9790
Fax: (314) 899-0282
Jacobson@ArchCityLawyers.com
Vianello@ArchCityLawyers.com

Attorneys for defendants

**CERTIFICATE OF SERVICE**

The filing attorney certifies that on January 25, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic case filing system upon all participants in the Court's electronic case filing system.