## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| PINEBROOK HOLDINGS, LLC, *et. al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Cause No. 19-cv-1562 |
| | ) |
| AARON NARUP, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW
## AND INCORPORATED SUGGESTIONS IN SUPPORT

Plaintiffs, by and through their counsel, moves under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law ("JMOL") on its claims against Defendants. In addition to any oral argument made in Court, Plaintiffs support their Motion as follows.

## I.    FACTS

Steve Reuter ("*Reuter*") and Aaron Narup ("*Narup*") were once trusted employees of PH Financial Services LLC, a wholly-owned subsidiary of Pinebrook Holdings LLC ("*Pinebrook*")[1], and its owner, Bob Zeitler ("*Zeitler*"). In fact, Reuter was more than just an employee – he was family[2]. Despite Reuter's position of trust within the company (and the family), Reuter plotted and schemed to advance the interests of his own loan store and then open a second competing loan store while still on Pinebrook's payroll.

Both Narup and Reuter learned from Pinebrook their key to success would be the implementation of Loan Management Software ("*LMS*")[3] used by their stores to service short-term loans. Since its inception, Store 36 had operated under a Management Services Agreement

---

[1] Pinebrook Holdings, LLC is the parent company and sole owner of all other Plaintiff entities. For the purposes of this brief, Plaintiffs will collectively refer to all Plaintiffs as either "*Plaintiffs*" or "*Pinebrook.*"

[2] Reuter's wife (Christine) and Zeitler's wife are sisters.

[3] Pinebrook's software vendor was Virinchi, who provided a loan management software called QFund.

("***MSA***") with PH Financial Services ("***PHFS***"). Under the MSA, Store 36 paid to PHFS a monthly fee, and in return, it received access to Plaintiffs' customized version of QFund loan management software. Moreover, because of his position of trust within the family and the business, Reuter had access to the components of Pinebrook's Business Plan and Model that encapsulated the plans, formulas and strategies for how Pinebrook operated its businesses. Pinebrook had invested more than a million dollars in customizing its version of QFund so that its loan operations would run seamlessly. Store 36 was allowed to use Pinebrook's version of QFund pursuant to the MSA.

In late 2017 and early 2018, two significant events happened. First, Narup and Reuter made the decision to start making plans to open a second loan store (known as "***Store 37***"), and to run both Store 36 and Store 37 independent from Pinebrook and without the benefit of the PHFS MSA. Second, Pinebrook began to implement its plan to upgrade its QFund software to QFund10, which would have allowed Plaintiffs the capability to write loans either online or in person by using the same software (known as Omni-Channel).

From March 2018 until October 2018, both Narup and Reuter used their time on the PHFS payroll to plan for the opening of Store 37. They used the time paid by PHFS to scout out a location, hire vendors, and purchase equipment. There were emails and text messages introduced into evidence showing the volume of time Narup and Reuter were being paid by PHFS while working to get Store 37 opened. What they were **not** doing, however, was spending any time planning how they would be able to continue operation of Store 36 once they ended the MSA with PHFS. Instead, Narup admitted to copying a sharefile drive from Pinebrook's server that contained all the contracts, business forms, and other crucial information that would allow them to continue to operate Store 36 without missing a beat. Thus, instead of spending the time hiring lawyers to create their own contracts and drafting their own policies and strategies, Defendants simply downloaded and took the ones owned by Pinebrook. So, when Store 36 ended its MSA with PHFS, Defendants

2

easily picked up without any interruption in business operations because Defendants had absconded with Pinebrook's confidential information and trade secrets before they left.

Significantly, because of Narup's relationship with Virinchi while he was employed by PHFS, Narup simply directed Virinchi to copy all of Plaintiffs' QFund customizations that had cost them more than a million dollars to design and develop. Extensive emails have been introduced into evidence showing Narup's dealings. In the end, Defendants skipped the process of designing, planning and investing in their own QFund customizations, and moved straight to signing a new contract with Virinchi that included all the customizations that were proprietary to Pinebrook. And if there was any doubt that Narup knew Pinebrook's QFund customizations were proprietary, the undisputed evidence shows that he waited to move the contract with Virinchi into Defendants' names until after he had incorporated all of Pinebrook's customizations into the version of QFund that would be migrated over to Defendants' contract with Virinchi.

Part of Pinebrook's overall business plan and strategy was to upgrade its QFund software to QFund10, which would allow its stores to service loans simultaneously in person and online (also referred to as an Omni Channel platform).[4] Brian Stoltz testified at length about how the ability to write loans to customers both online and through its storefront locations would help Pinebrook stores increase their individual loan profits by allowing the stores to service customers who want the ability to manage their loans both online and in-person. Moreover, Stoltz explained how the online capabilities of Omni-Channel would allow Pinebrook to write loans to online customers in states in which they were licensed but where loans to in-person customers were generally limited to the small geographic area surrounding the store. Pinebrook hoped to capitalize

---

[4] Prior to the upgrade, Pinebrook loan stores were only capable of servicing loans in person at storefront locations.

3

on the existing infrastructure in place, and simply "add on" the online products which would add to profits without duplicating many of the operating expenses.

Therefore, Pinebrook negotiated the QFund10 upgrade with Virinchi in 2017, and the evidence shows that the Company planned to begin the upgrade process in early 2018. Pinebrook's upgrade to QFund10 was to be handled by Narup, who described himself as Pinebrook's "QFund liaison." But, instead of following the rollout plan established by Pinebrook, Narup seized this upgrade opportunity for Store 36, which was owned by Reuter.

Contrary to Pinebrook's interests and without authorization by Plaintiffs, the extensive email communications introduced at trial evidence Narup's instructions to Virinchi (the QFund10 vendor) to ignore the approved upgrade plan[5], and upgrade Reuter's Store 36 (instead of Pinebrook's Store 26). For eight months, Narup kept the upgrade of Store 36 veiled in secrecy, and expressly instructed Virinchi to maintain strict confidentiality regarding the change in plans. In the meantime, Narup remained on PFHS's payroll until the upgrade of Store 36 was complete (and their new Store 37 was about ready to open). Narup remained on PHFS' payroll until Store 36's QFund10 was ready to go live, and then he quit– leaving Pinebrook with no IT Manager and no upgraded LMS to keep up with the fast-paced business of short-term loans. And, instead of being honest about the reason for his departure – Narup told Pinebrook he was going to work with a friend in construction – a blatant lie with no purpose other than to cover-up his misdeeds while on PFHS's payroll.

Following Narup's and Reuter's departures, Pinebrook worked diligently to regain the ground lost in moving forward with an LMS upgrade. First, Stoltz testified about he and the rest of the Pinebrook team were forced to try to untangle the mess left by the diversion of its QFund10

---

[5] The approved upgrade plan dictated that the first store to be upgraded was Store 26, which is a Pinebrook loan store located in New Mexico.

4

upgrade, and to reconstitute their relationship with the QFund10 vendor (Virinchi). Pinebrook was forced to expend valuable time investigating the impact to the upgrade and overall operations caused by Narup's misdeeds. After finally becoming comfortable that the upgrade with Virinchi could proceed, Pinebrook was able to begin its upgrade to QFund10 - - - eighteen months later than initially planned.

Pinebrook began upgrading its first store to QFund10 in approximately September 2019. Just a few months into the upgrade process, the Covid-19 Global Pandemic literally brought the world to a stop. By March 2020, there were worldwide shutdown orders in place, and business operations were halted. Thus, Virinchi was not able to provide the manpower needed to continue pushing forward with the upgrade, which would have allowed Pinebrook to service its loans online – something that would have been invaluable while the world was shutdown because online businesses were essentially the only ones able to operate effectively.

Defendants' misconduct resulted in a domino effect for Pinebrook: Their "QFund" liaison in charge of their software upgrade was gone; they were set back 18 months in their upgrade process; their QFund10 vendor could not provide support due to a Global Pandemic; and, the only businesses thriving in that Pandemic were those who could operate online, which Pinebrook was unable to do because Defendants' took their upgrade opportunity for themselves. As a result, Defendants gained a valuable competitive advantage by leading Pinebrook by 18 months in the upgrade efforts. While Defendants' businesses began writing loans and reaping profits during the Pandemic, Pinebrook was left wondering when the world would re-open so they could resume their efforts to upgrade their LMS and begin writing both in-person and online loans through their stores.

Plaintiffs commenced this lawsuit to redress the damages caused by Defendants and their breach of loyalty, misappropriation of trade secrets, and other egregious actions. Plaintiffs are not

5

only seeking damages for the profits they lost as a result of Defendants' actions, but Plaintiffs also seek to recoup the amounts by which Defendants were unjustly enriched by their misconduct. Further, Plaintiffs are also seeking punitive damages to punish and deter others from similar conduct in the future. Plaintiffs now move for judgment as a matter of law because it has proven all elements of its claims beyond any reasonable inference.

## II.  LEGAL STANDARD

A plaintiff is entitled to judgment as a matter of law if, after the defendant has been heard on the issue, there is no legally sufficient evidentiary basis for a reasonable jury to find against the plaintiff. Fed. R. Civ. P. 50(a)(1). JMOL is appropriate when "all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 878 (8th Cir. 2005). "An inference is reasonable if it may be drawn from the evidence without resort to speculation." *Id.* (emphasis added) (internal quotations omitted). When reviewing a motion for JMOL, a district court "may, in considering the whole record, give credence to the moving party's uncontradicted and unimpeached evidence." *Id.*

## III.  NARUP AND REUTER VIOLATED THEIR DUTY OF LOYALTY IN MULTIPLE WAYS WHILE EMPLOYED BY PINEBROOK.

An employee owes a duty of loyalty to his employer that he must not, while employed "act contrary to the employer's interests." *Control Tech. & Solutions LLC v Omni Energy Partners LLC*, 2021 WL 6049812, \*6 (E.D. Mo 2021, *citing Nat'l Rejectors Inc v. Trieman*, 409 S.W.2d 1, 41 (Mo. banc 1966). Conduct that breaches the duty of loyalty includes engaging in direct competition, *using confidential information unique to or acquired from the employer, acting contrary to the employer's interests*, or other acts that result in direct competition. *Id.* (emphasis added). Here, while still employed by PFHS, Narup and Reuter used Pinebrook's confidential information and trade secrets, and acted contrary to Pinebrook's interests by taking Pinebrook's

6

QFund10 upgrade and using Plaintiffs' resources to set up their competing business, all of which breach their duty of loyalty under Missouri law.

As a preliminary matter, the undisputed evidence at trial established that both Reuter and Narup spent nearly a year while on Pinebrook's payroll taking all necessary steps to upgrade Store 36 to QFund10, and to set up from its inception their new store, Store 37. The emails alone show an on-going pattern of both Reuter and Narup spending significant amounts of time *during working hours* in furtherance of their personal interests in Stores 36 and 37. While on Pinebrook's payroll, they sent emails and text messages, made phone calls, made site visits, and used Pinebrook's equipment and resources (including vendor lists and confidential documents), all in furtherance of Stores 36 and 37. And, while still on Pinebrook's dime, Narup downloaded hundreds of Pinebrook's business files that allowed Defendants' to continue operation of Store 36 with no interruption in business after abandoning PHFS' services under the MSA.

Here, Narup's and Reuter's actions were far from isolated. Their email communications show they worked in concert to divert the QFund10 upgrade from Pinebrook's loan store to their own. Instead of planning for their transition from the MSA and managing the operations of their own loan stores with their own business materials, they admittedly took Pinebrook's documents for use in their competing business. They saved time "planning" for their businesses by hijacking and using Pinebrook's proprietary business model which included their materials, plans, vendors, marketing methods, and overall business strategies down to the smallest detail. They spent countless hours on Pinebrook's payroll finding a location for their new business (Store 37), and preparing to open that business. And then, Narup resigned as soon as Store 36 was ready to go live with QFund10, and very shortly before Store 37 opened. Narup and Reuter were able to set up a brand new business while being paid by their soon-to-be competitor. Narup's and Reuter's actions,

7

taken as a whole, leave no issue of fact for a jury to decide. This Court should grant judgment as a matter of law on Plaintiffs' breach of duty of loyalty claim.

## IV. DEFENDANTS MISAPPROPRIATED PLAINTIFFS' TRADE SECRETS WHEN THEY STOLE QFUND AND PLAINTIFFS' ENTIRE BUSINESS METHOD.

Under both federal and Missouri law, trade secrets are very broadly defined to include "patterns, plans, compilations, program devices, formulas, designs, prototypes, *methods*, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." *Design Nine, Inc. v. Arch Rail Grp., LLC*, 2019 WL 1326677, at *3 (E.D. Mo. Mar. 25, 2019) (quoting 18 U.S.C. § 1839(3)) (emphasis added); Mo. Rev. Stat. § 417.453(4) (emphasis added).

This case involves claims related to both confidential information and trade secrets. Those terms are often tossed around in an indiscriminate manner, and used interchangeably when, in fact, they carry very different definitions and legal consequences. In this case, "confidential information" is defined by the Confidentiality Agreement between PHFS and Narup and Reuter. Defendants are prohibited from using, disclosing or retaining Plaintiffs' confidential information, and doing so could result in a breach of their contracts. By contrast, "trade secret" is term defined by statute and case law. Information can be confidential yet not be considered a trade secret. But, by its very definition, a trade secret requires it be protected and confidentiality upheld. Thus, all trade secrets are confidential information but not all confidential information is a trade secret. Plaintiffs' business method is a protectable trade secret.

The term "method" is broadly defined to include an employer's "method of doing business." *Elm City Cheese Co. v. Federico*, 251 Conn. 59, 74, 752 A.2d 1037, 1046 (1999); *see also Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir.1972) (affirmed a finding that a business plan

8

for selling funeral services was entitled to trade secret protection where "[t]he plan ... encompassed all of the forms, information, and techniques, for formulating, promoting, financing, and selling contracts for 'prepaid' funeral services in the continuous operation of a mortician's business."); *California Intelligence Bureau v. Cunningham*, 83 Cal.App.2d 197, 199, 188 P.2d 303 (1948) (holding that the method of operating a business that consisted of procuring, digesting and analyzing information concerning solicitations for funds for charitable purposes was a trade secret).

In this case, Defendants have identified two trade secrets that are protected by both the Missouri Uniform Trade Secrets Act ("MUTSA"): (1) Pinebrook's Business Plan and Model and (2) its customized version of QFund loan management software. While Plaintiffs' customized QFund software is a stand-alone trade secret, it is also one of the component parts that make up the Business Plan and Model, which also enjoys trade secret protections.

Defendants argue that Pinebrook's Business Plan is not a trade secret because one or more its component parts are not unique – that is, they are generally known or available. Defendants incorrectly argue that each component part of the overall business plan must be a trade secret in order for the plan, itself, to be a trade secret. That simply is not the law. Plaintiffs' theory of recovery for misappropriation of its Business Plan is premised on the idea that it is how the components are combined together that are unique. *See Elm City*, 752 A.2d at 1048 ("If the business were not unique – that is, if *both* the individual components of Elm City's business plan, *and* the way in which those *components are combined*, were generally known – City arguably would not be entitled to trade secret protection") (*emphasis added*). The concept is no different than a recipe being a trade secret; the individual ingredients may be commonly known and readily available, but it is how the ingredients are combined together that is unique and makes a trade secret. Here, Plaintiffs' overall business plan includes a multitude of factors such as the loan

software and documents used, vendor and supply costs, formulas for calculating loan fees and interest rates, advertising methods (including lead providers), historical data related to customers and the trends associated with default rates on loans, store location, budget, customer and employee policies, and all other components of the business that, when put together, make the Pinebrook entities what they are. At trial, Plaintiffs' representative provided extensive testimony as to how the Pinebrook entities develop and employ each of these factors in the operation of their business.

In this case, Defendants were able to skip months (if not years) of hard work and "trial and error" that most businesses must endure, because they stole Plaintiffs' method of doing business (including Plaintiffs' customized LMS). Thus, Plaintiff's business methods are protectable trade secrets. Defendants did not just use one aspect of Plaintiffs' business model but instead used all the elements taken as a whole to further their own personal interests related to Stores 36 and 37. If Defendants truly believed the elements of Pinebrook's business model were not confidential or proprietary, then why (1) take documents without permission, (2) usurp the software upgrade opportunity for Store 36, (3) conceal the plan to open Store 37, (4) use non-PHFS email addresses to send documents and information related to Stores 36 and 37, (5) lie about the reason for Narup's resignation, and (6) affirmatively ask the software vendor not to reveal any information to PHFS (the actual entity that had the software agreement with the vendor). The emails evidencing Plaintiffs' actions in this case leave no question that Plaintiffs' business methods are confidential, and protectable trade secrets.

## a. *Plaintiffs' version of the QFund/QFund10 software is a protectable trade secret.*

Plaintiffs have also shown – and Defendants have also failed to refute – that its customized version of QFund is also a trade secret, even when analyzed separate and apart from Plaintiffs'

10

overall business plan. Throughout this trial, Defendants have presented evidence and argument that QFund is not a protectable trade secret. But Plaintiffs have presented sufficient evidence to show that, while it is not QFund, in general, that is a trade secret, Plaintiffs' customizations that create Plaintiffs' version of the software *do* create a protectable trade secret.

At trial, Defendant Narup himself provided testimony in support of Plaintiffs' argument when explaining why he preferred Infinity[6] software over QFund. Narup admitted that he preferred Infinity because it is "shared software," meaning all the customizations that customers put into Infinity are available to everyone. In contrast, Narup admitted, QFund provides each of their customers their own individual instance of QFund, based on that customer's specifications and customizations. Simply put, Narup did not like QFund because customizations are proprietary and not shared amongst QFund users. He preferred the software that allowed him to benefit from the customizations designed and created by other users.

When Plaintiffs' loan companies first signed a contract with Virinchi to purchase and implement its LMS, it received a "base" version of QFund. This base QFund is available to any and all customers of Virinchi. However, after that, Plaintiffs – just like Virinchi's other customers – customized QFund to function in a way that is tailored specifically to Plaintiffs' business model. The fact Virinchi does *not* share these customizations with its other customers is precisely why Narup said he ultimately preferred Infinity over QFund. There is no question Plaintiffs' version of QFund is Plaintiffs' property.

Defendants have also tried to evade their misappropriation of Plaintiffs' QFund software by claiming they were ultimately able to license the QFund software from Virinchi. That wholly ignores that the version of QFund they ended up licensing includes all of Plaintiffs' customizations.

---

[6] Infinity is also a loan management software that offers some of the same basic products and solutions as QFund.

11

Defendants were only able to get Plaintiffs' version of QFund into their stores by misrepresenting themselves as agents of Plaintiffs, even though they were, in fact, working against Plaintiffs' interests for the benefit of ACS. Those customizations were designed and owned by Pinebrook, and no one other than Plaintiffs could give permission to take or use them. Defendants clearly obtained Plaintiffs' version of QFund through improper means. *See* Section 417.453(1), RSMo (the MUTSA includes "misrepresentation" and "espionage" in its definitions of "improper means").

### b. *Plaintiffs' took reasonable steps to protect their confidential trade secrets.*

An essential element of any trade secret claim is that Plaintiffs took reasonable measures to protect their trade secrets. Here, Plaintiffs did take reasonable steps to protect their trade secrets and confidential information. First, both Narup and Reuter had confidentiality agreements that mandated they not use or disclose Plaintiffs' confidential information. Plaintiffs trusted both Narup and Reuter as long-time employees. Reuter was quite literally a member of the Pinebrook "family." To this point, neither Reuter nor Narup had done anything to put Plaintiffs on notice that additional measures were necessary to protect their trade secrets from family.

Defendants argue that the MSA allowed Store 36 to use Plaintiffs' proprietary version of QFund software without a specific confidentiality clause; but this argument wholly ignores the unique facts and circumstances of this case. All of Plaintiffs' other loan stores operating under the MSA are under the Pinebrook umbrella – 100% of their profits flow up to Pinebrook, and they share a complete unity of interest. Reuter's Store 36 is the sole exception, and he was only permitted the opportunity to purchase that store because of his special relationship as a member of the family.

12

*Elm City*, albeit from a foreign jurisdiction[7], is particularly instructive here. 752 A.2d 1037 (1999). In *Elm City*, the defendant was the plaintiff's former accountant who left to run a competing business, in which he used certain of the plaintiff's confidential information. *Id.* at 1050-52. However, the defendant was not just the plaintiff's accountant, but a close personal friend of the owner who was brought into the business despite having no prior experience in the industry. *Id.* at 1052. The defendant argued that the plaintiff did not take reasonable steps to protect its confidential information because defendant was not party to any confidentiality agreement. *Id.* at 1050. Disagreeing, the court found that "in light of the close personal relationship" between the parties, the plaintiff's decision "not to take affirmative steps to ensure the secrecy of its information with respect to [the defendant] constituted reasonable efforts under the circumstances." *Id.* at 1052.

Similarly, here, Stoltz and Reuter provided testimony to show that Reuter was able to purchase Store 36 primarily because he was a family member, and a PH employee. Reuter's purchase of Store 36 created a unique situation where it was the only store managed by PHFS where the profits from Store 36 flowed to Reuter instead of Pinebrook. Here, Reuter had a confidentiality agreement and was also a member of the family. No other outside party was granted such access to Plaintiffs' confidential information. Like in *Elm City*, it was reasonable here for Plaintiffs to feel comfortable entering into the MSA with Reuter for Store 36 without asking him to sign a new, additional confidentiality agreement. Simply stated, the parties had a long-standing familial (literally) relationship and significantly, Reuter, as a long-time PHFS employee, *had already entered into a strict confidentiality agreement with Plaintiffs* that required him to keep all of Plaintiffs' information confidential.

---

[7] While *Elm City* analyzes the Connecticut Uniform Trade Secrets Act ("*CUTSA*"), the CUTSA uses the same "reasonable efforts" standard. *Id.* at 1050.

Further, ACS and Store 36 must operate through their agents and employees. Store 36 was owned and operated by Reuter, who was subject to a confidentiality agreement with Pinebrook. Thus, it would have been a violation of Reuter's confidentiality agreement for him to use Pinebrook's confidential information in violation of the agreement. No one other than Reuter (and some of Pinebrook's other employees including Narup) were privy to the details of Pinebrook's trade secrets by virtue of PHFS' management of Store 36 under the MSA. For these reasons, Defendants should be found liable on Plaintiffs' trade secret claims.

## V.   NARUP AND REUTER EACH BREACHED THEIR RESPECTIVE CONTRACTS WITH PHFS

Both Narup and Reuter violated their respective Confidentiality and Non-Solicitation Agreements with PHFS. The Confidential Information Section of the Agreements requires Narup and Reuter to maintain the confidentiality of and not use or disclose PHFS's Confidential Information or Trade Secrets. Both Narup and Reuter used PHFS's confidential business information and trade secrets beyond what was articulated in the MSA to further their own interests in establishing a competing business in direct contravention of their respective Confidentiality and Non-Solicitation Agreements they signed in consideration of their continued employment with PHFS years earlier. Many of the components of Plaintiffs' Business Plan and Model are pieces of confidential information covered by the Confidentiality Agreement. A glaring example of how Narup violated the confidentiality agreement is his admission that he downloaded Pinebrook's documents from its sharefile drive. Narup took, retained and used Pinebrook's confidential information in the operation of competing loan stores (Stores 36 and 37).

Narup and Reuter breached their agreements where they retained, disclosed and used PHFS's confidential information to run their ACS business (outside the scope of the MSA). As

14

such, Plaintiffs are entitled to a ruling as a matter of law on Narup's and Reuter's breach of their respective contracts.

## VI. DEFENDANTS ARE LIABLE FOR TORTIOUS INTERFERENCE WHERE DEFENDANTS TORTIOUSLY INTERFERED WITH NARUP'S AND REUTER'S AGREEMENTS WITH PLAINTIFFS.

Tortious interference with a contract requires five elements: "(1) a contract; (2) defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from defendant's conduct." *Rail Switching Servs., Inc. v. Marquis-Missouri Terminal, LLC*, 533 S.W.3d 245, 259 (Mo. Ct. App. 2017). Here, there is no dispute there was a valid employment contract between PH Financial, LLC, and Narup and Reuter, respectively. That leaves the remaining four elements of the claim.

The element is "knowledge of the contract," but Plaintiffs do not have to prove **actual** knowledge. *See Robb v. Bond Purchase, L.L.C.*, 580 S.W.3d 70, 85 (Mo. Ct. App. 2019). Rather, Plaintiffs must merely show that Defendants had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract.[8] *Id.* Here, both Narup and Reuter had the same Confidentiality Agreement. Thus, it was clearly reasonable that Narup and Reuter should have known the other was subject to the same confidentiality agreement because they were both employees of the same company, and each had a contract with that company. Moreover, when forming their new company ACSM-II, both signed similar agreements, which are common in highly competitive businesses, such as the short-term loan industry.

Next, Plaintiffs must prove interference with the contract. Defendants clearly interfered with the other's contract when Defendants decided to work together, against Plaintiffs' interests,

---

[8] Nor is it necessary for Defendants "to appreciate the legal significance of the facts that give rise to the contractual duty… If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding." *Howard v. Youngman*, 81 S.W.3d 101, 113 (Mo. Ct. App. 2002).

operating a competing loan business. And, Defendants' failed to introduce any evidence in support of any justification for Defendants' nefarious conduct related to the planning and preparation for opening Store 37, and the continuous operation of Store 36 by using Plaintiffs' business model and confidential information. The absence of justification element has been clearly established at trial. Finally, Plaintiffs were damaged when Narup and Reuter interfered with the other's contract that required they maintain the confidentiality of Plaintiffs' confidential information and refrain from using that information in a competing business, and both were unjustly enriched by their tortious interference.

## VII. **DEFENDANTS WERE UNJUSTLY ENRICHED BY THEIR MISCONDUCT.**

The essential elements of unjust enrichment are: "(1) the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit." *Cent. Parking Sys. of Missouri, LLC v. Tucker Parking Holdings, LLC*, 519 S.W.3d 485, 498 (Mo. Ct. App. 2017). Simply put, unjust enrichment is an equitable remedy that prevents a party from profiting from their own misdeeds. In this case, there are multiple ways that Defendants were unjustly enriched by their numerous acts of misconduct which were done with the specific intent to benefit Defendants.

First, while plotting and planning to open a competing loan store, Defendants Reuter and Narup did so while on the payroll of PHFS. So, instead of losing pay for the time they spent working to open Store 37 (which was not yet generating any income), they simply did that work while on Plaintiffs' payroll. Reuter and Narup both benefitted from being paid by PHFS while working in direct competition to other Pinebrook entities.

Next, *all* Defendants benefitted from the confidential information and trade secrets taken by Reuter and Narup for use in the operation of Store 36 and Store 37. Even though Reuter and Narup used their time on Pinebrook's payroll to get ready to open Store 37, by contrast, they did

16

virtually nothing to assure the continued operation of Store 36 once the MSA was terminated. So, in order to continue uninterrupted operations of Store 36, Defendants took Plaintiffs' confidential information and trade secrets, including its Business Plan and Model and its customized version of QFund software. That allowed Plaintiffs to terminate their MSA with PHFS and have no business interruptions in the transition because they "took" everything they needed from Pinebrook in order to continue operating Store 36. Defendants benefitted from the value of the confidential information and trade secrets taken, and also benefitted from not paying for some of that same information through the MSA (at a cost of $1,675.00 per month).

Finally, one of the most significant ways Defendants were unjustly enriched was through their "taking" of Plaintiffs' QFund10 opportunity. Because Defendants took Pinebrook's QFund upgrade of Store 26, Defendants enjoyed a very significant head start in crossing the finish line to writing loans in an Omni-Channel fashion. In fact, because Narup and the other Defendants usurped Pinebrook's QFund10 upgrade for their own benefit, Defendants were able to begin writing online loans at least 18 months earlier than they otherwise would have been able to. All the Defendants benefitted from that head start – including Defendant Christine Reuter, as part-owner of the competing business. To the extent RN Financial was able to write online loans earlier than it could have but for Defendants' misconduct, the owners of that business were enriched at Plaintiffs' expense too.

RN Financial d/b/a Deer Ridge began writing online loans in July 2020 using the same plan for writing in-person and online loans through a single store front location – a process that began with Defendants' taking of Plaintiffs' QFund10 upgrade opportunity. It would be unjust to allow Defendants to retain the profits generated from servicing loans online during a period where – because of Defendants' conduct – Plaintiffs themselves had not established an ability to service both online and in-person loans from a single store front. *See Member Servs., Inc. v. Sec. Mut. Life*

17

*Ins. Co. of New York*, 2010 WL 3907489, at *12 (N.D.N.Y. Sept. 30, 2010). The loan profits from RN's online loans are a direct result of Defendants' misconduct that resulted in an unjust benefit to Defendants. Plaintiffs have established their unjust enrichment claim as a matter of law.

## VIII. PLAINTIFFS HAVE ESTABLISHED A CLAIM FOR CIVIL CONSPIRACY.

To demonstrate a civil conspiracy existed, Plaintiffs must show: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) Plaintiffs were thereby damaged. *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc 2012), *citing Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. banc 1999). "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff." *Id.*

Here, Plaintiffs have proven an ongoing scheme by Defendants (particularly Narup and Reuter) to steal Plaintiffs' confidential information and trade secrets, and to divert opportunities from Plaintiffs to Defendants for their own benefit. As discussed above, Plaintiffs have presented evidence to prove, beyond question, each of the above claims against Defendants. Thus, these underlying causes of action against Defendants are sufficient for a finding of civil conspiracy as a matter of law.

## IX. PLAINTIFFS' DAMAGES

Plaintiffs presented sufficient evidence at trial to establish *the existence* of Plaintiffs' lost profits, and *the amount* of profits likely lost due to Defendants' continued wrongdoing. Specifically, Plaintiffs proved the following damages:

1. Lost profits to each of their 44 stores as a result of Narup's and Reuter's taking of Plaintiffs' QFund10 upgrade that resulted in a delay of 18 months in the ability of Plaintiffs' stores to write both in person and online loans.

18

2. Lost profits to PHFS as a result of Defendants' misappropriation of Plaintiffs' trade secrets that allowed Defendants to continue normal business operations without payment of any fees under the MSA.

3. Unjust enrichment to Defendants (as discussed above).

"[A] plaintiff may recover for lost profits that he or she establishes with reasonable – not absolute – certainty." *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 195 (Mo. Ct. App. 2007). **"Certainty," however, means only that plaintiff suffered *some* damages, not exact proof of the amount.** *Id.* at 195-96; *see also Parshall v. Buetzer*, 195 S.W.3d 515, 522 (Mo. Ct. App. 2006) (emphasis added). "Where the fact of damage is clear, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court." *BMK Corp. v. Clayton Corp.*, 226 S.W.3d at 196. Once a plaintiff has established the fact of lost profits, Missouri law merely requires that the amount of lost profits "be supported by the best evidence available." *Id.*; *see also Parshall*, 195 S.W.3d at 522 ("Where damages are in the nature of lost profits, all that can be required is to produce all relevant facts tending to show the extent of damages.").

### a. *Plaintiffs have established the existence of lost profits.*

Defendants' conduct, taken as a whole, resulted in significant damages to Plaintiffs in the form of lost profits. Defendants took confidential documents, stole Plaintiffs' proprietary business model, set up a new loan business while on Pinebrook's payroll, and illegally diverted the QFund10 upgrade from Plaintiffs' stores to their own stores, which delayed Plaintiffs' ability to service loans online and in person to potential customers throughout the state. Defendants' interference with Plaintiffs' QFund10 upgrade put Plaintiffs many months behind in gaining the ability to sell their loan products over the internet, which is something Defendants have been able to do since July 2020. Based on the testimony of Plaintiffs' representative Brian Stoltz, detailing the extent of Plaintiffs' delay in getting an Omni Channel platform due in large part to Defendants'

19

conduct, and the timeline within which Defendants were able to begin writing online loans from their store front, Plaintiffs have established a period of 18 months of lost profits associated with that delay.

### *b.* *Plaintiffs have established the existence of lost profits, and supported the amount of lost profits with the best evidence available.*

"[T]he Supreme Court has repeatedly made clear that once the fact of damage is established, the amount of damages requires a lesser degree of proof." *Cent. Telecommunications, Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711, 730 (8th Cir. 1986) (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565–67 (1981)). "The requirement for proof of loss of profits is not absolute certainty, but only a sufficient factual base that the estimate of the loss is not based upon speculation and conjecture." *Swiss Am. Importing Co., v. Variety Food Prods. Co.*, 471 S.W.2d 688, 690 (Mo. Ct. App. 1971). Lost profits are generally proven by one of two methods: (1) the "before and after" theory or (2) the "yardstick test." *4 Corners Ins., Inc. v. Sun Publications of Florida*, 5 So.3d 780, 783 (Fl. 2nd Dist. 2009). The court in *4 Corners* explained the "yardstick test" as follows:

> The yardstick test is generally used when a business has not been established long enough to compile an earnings record that would sufficiently demonstrate lost profits. This test compares the profits of businesses "that are closely comparable to the plaintiffs."

*Id.* (emphasis added).

The "yardstick test" described by the court in *4 Corners* is equally applicable to Plaintiffs' lost profits claims here. Defendants' conduct prevented Plaintiffs from competing in the new market of servicing online loans. Here, Plaintiffs have put forth the best evidence available in the form of a detailed lost profits projection, supported by the testimony of Plaintiffs' COO Brian Stoltz. *See BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 195 (Mo. Ct. App. 2007) ("[A] business owner's testimonial evidence is sufficient to provide the trier of fact with a rational basis for

20

estimating damages to the plaintiff, including lost profits."); *Eagle Fuels, LLC v. Perrin*, 2014 WL 12601079, at \*8 (W.D. Mo. Sept. 12, 2014) ("Generally a business owner's testimonial evidence is sufficient to provide the trier of fact with a rational basis for estimating damage to the plaintiff, including lost profits.").

Stoltz projects that, with the ability to service loans both in-person and online, Plaintiffs would be able to write an additional 15 loans per month, per store. In developing this revenue projection, Stoltz testified that he considered the types of loans that Plaintiffs can write out of each store (35 or more per month), the loans that Blue Frog[9] could write, and the Omni Channel numbers of a publicly traded competitor, CURO Financial.

Stoltz's projections are very conservative, and in fact, supported by the loans written by Plaintiffs' store beginning in December 2022. Moreover, those projections are far below what Defendants are writing in their own store. Finally, CURO Financial's Omni Channel, for example, allows it to write approximately 48 online loans per store, per month. *See Malatesta v. Leichter*, 186 Ill. App. 3d 602, 622, 542 N.E.2d 768, 782 (1989) (holding that the evidence of profits of a person other than plaintiff, who operated the same type of business during the same period, "is not of such a speculative nature to require a finding that plaintiff's lost profits may not be proved to a reasonable certainty"). Plaintiffs estimate of lost profits of 15 additional loans per month is highly conservative given what other comparable loan stores are doing, particularly Defendants in this case.

Stoltz explained to the jury, in detail, exactly how he arrived at his lost profits calculations – even going so far as to type the numbers into a calculator while on the stand. *See United Fire &*

---

[9] Blue Frog, the trade name for Danridge Holdings, is Plaintiffs' entity that does online loans. While a customer can take out a loan online through Blue Frog, there is no way for a customer to engage with one of Plaintiffs' brick and mortar stores for an online loan without an Omni Channel platform, which is why an Omni Channel platform is so impactful on a loan store's profitability. Moreover, due to regulations and licensing, Blue Frog cannot operate in all states.

21

*Cas. Co. v. Historic Pres. Tr.*, 265 F.3d 722, 730 (8th Cir. 2001) (upholding lost profits award based on estimate of entity's sole trustee where trustee "fully explained to the jury how he had calculated the Inn's lost profits"). Stoltz's calculations are specific to each individual loan store, and he has explained to the jury how every single amount was calculated. The calculations contain appropriate "ramp ups" for the time it takes for a store to reach maximum loan writing capabilities, and also account for the staggered rollout plan of the expected QFund10/Omni Channel upgrade. Stoltz's testimony provided the best evidence available to demonstrate Plaintiffs' amount of lost profits.

## X. CONCLUSION

In accordance with Federal Rules of Civil Procedure 50(a) and the evidence and testimony set forth above, a reasonable jury would not have a legally sufficient evidentiary basis to find for the Defendants on any of Plaintiffs' claims. Plaintiffs have established every element of each one of their claims. Accordingly, Plaintiffs request that the Court resolves this issue against the Defendants and enter judgement as a matter of law in Plaintiffs' favor, and send the case to the jury on the sole issue of the amount of damages and punitive damages owed to Plaintiffs.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**

*/s/ Burton D. Garland, Jr.*
Burton D. Garland, Jr., 46720MO
Melissa M. Pesce, 46814MO
Samuel W. Newman, 69443MO
7700 Bonhomme Avenue, Suite 650
St. Louis, Missouri 63105
Telephone: 314-802-3935
Facsimile: 314-802-3936
Burton.Garland@ogletree.com
Melissa.Pesce@ogletree.com
Samuel.Newman@ogletree.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 26, 2023:

*/s/ Burton D. Garland, Jr.*